**Bobby Nick WARD, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**
and
**Everett Construction Company, Inc., et al., Intervenors.**

No. 71-2837
Summary Calendar.*

United States Court of Appeals, Fifth Circuit.

June 9, 1972.

* [1] Rule 18, 5 Cir.; see Isbell Enterprises, Inc. v. Citizens Casualty Company of New York et al. 5 Cir., 1970, 431 F.2d 409, Part I.

George M. Bishop, Tipton, Bishop & Company, Houston, Tex., attorney for appellant.

Peter G. Nash, General Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Paul J. Spielberg, R. Bruce McLean, N.L.R.B., Washington, D. C., Charles M. Paschal, Jr., Director, N.L.R.B., Region 15, New Orleans, La., for N.L.R.B.

William D. Deakins, Jr., John Smither, Houston, Tex., Vinson, Elkins, Searls & Smith, Houston, Tex., of counsel, for Everett.

Jerry L. Gardner, Jr., Dodd, Hirsch, Barker, Meunier, Boudreaux & Lamy, New Orleans, La., for Local and Gilco.

Before JOHN R. BROWN, Chief Judge, and GOLDBERG and MORGAN, Circuit Judges.

JOHN R. BROWN, Chief Judge.

Petitioner Bobby Nick Ward filed unfair labor practice charges against Everett Construction Company, Gilco Construction Company, and Plumbers and Pipefitters Local 198, alleging that both companies and the union had violated § 8 of the National Labor Relations Act, 29 U.S.C.A. § 158, by terminating or causing the termination of his employment because he was not a union member. Following a hearing on a consolidated complaint the Trial Examiner found that Ward had been illegally discharged because of his non-membership in Local 198 and not, as contended by the respondents, because he was not a resident of the locality in which he was employed. The Board rejected this finding and dismissed the complaint, holding that the evidence "creates no more than a suspicion that the Union would not have sought [Ward's] discharge, despite his out-of-town status, if he had been a union member." 186 NLRB No. 40 (1970).

Only in the most rare and unusual cases will an appellate court conclude that a finding of fact made by the National Labor Relations Board is not supported by substantial evidence. This is one of them. We vacate and remand for entry of an order consistent with the original findings and decision of the Trial Examiner.

The facts are relatively uncomplicated. During the last week in October, 1969 Everett began work under a contract with United Gas Pipeline Company for the construction of a compressor and meter station several miles north of Opelousas, Louisiana. Gilco, a local contracting firm, provided heavy equipment and operators for the preliminary clearing and grading of the site. Because Everett was an out-of-state, Houston-based company it was not a signatory to a master working agreement between area contractors and Local 198, by the terms of which all job vacancies requiring welders and other allied craftsmen within the union's trade jurisdiction would be filled by exclusive referral through the union's hiring hall.[1] As a result Ward and

---

1. This agreement, to which Everett ultimately acceded but which was apparently never actually signed, provided that applicants for employment would be selected for referral on the basis of such criteria as qualification, seniority and residence, without discrimination on account of membership or nonmembership in the union. Similar arrangements designed to accord job preference to workers living within the local labor market are relatively commonplace in the construction industry and are explicitly sanctioned by § 8(f) (4) of the Act, 29 U.S.C.A. § 158(f) (4).

Both the Board and the respondents seemed to attach considerable *evidentiary* significance to the undisputed *legal* precept that such exclusive referral agreements are not unlawful so long as in their practical operation and effect they do not discriminate against employees on the basis of union affiliation or the lack of it. Local 357, International Brotherhood of Teamsters v. N.L.R.B., 1961, 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11; N.L.R.B. v. News Syndicate Co., 1961, 365 U.S. 695, 81 S.Ct. 849, 6 L.Ed.2d 29. The problem with the Board's abstract reaffirmation of this concededly sound principle of law is that it apparently bears no relationship whatever to any issue in the case. Nothing in the Trial Examiner's extensive written decision suggests that he viewed the mere existence of the agreement as evidencing illegal discrimination against nonunion employees or that he mistakenly inferred a tainted purpose from it. While the bare fact of the agreement provided no basis for the inference that Ward's discharge was unlawful, there was likewise no foundation for the supposition that the discharge was legal

several other nonresident, nonunion welders were hired directly by Thomas Haynie, Everett's job supervisor, sometime in early November.

At some time during the first week in November three unemployed local workers passed the construction site and learned that Ward and the other welders had been imported for the job from out-of-state. One of these men then notified local union representatives, which resulted in a visit to the project by John Trotti, assistant business manager for Local 198, and Bill West, business manager for Ironworkers Local 623. Trotti first asked Haynie whether the work had been bid in as a union job and received a negative answer, after which the three men held a short meeting in Haynie's office. Following the meeting Haynie asked Ward whether he and the other men had a union book. Ward replied that he was not certain about the others but that he did not.

On November 10 Haynie met with union officials at the office of the local sheriff for the purpose of negotiating a settlement of the dispute. During this meeting Haynie told Albert Durbin, Local 198's business manager, that he would hire all unemployed local welders who were qualifed for the job. Durbin replied that no workers could be referred through the union unless an agreement were signed. Haynie stated that he had no authority to sign such an agreement but that he would contact Claude Everett, the president of the company.

On the following Friday, November 14, after employees of Everett and Gilco had started work, between eight and ten men (including Local 198's Trotti) established a picket line at the gate entrance to the site, but they dispersed before quitting time, and there were no incidents. However, on Monday morning approximately 50 to 60 pickets arrived early and blocked the gate. Haynie sought the assistance of the sheriff, who went out and talked to the pickets, after-

ward informing Haynie that they were not going to interfere with the progress of the work. When the sheriff left Trotti told Haynie that nothing had changed, and the picketing continued. None of Everett's employees were permitted to pass.

Haynie then telephoned Claude Everett in Houston and explained the situation to him. Everett flew to Opelousas that night and arranged for Gil Cortez, Gilco's president, to act as "management and personnel consultant" for Everett in its dealing with the union. Cortez was a long-time resident of the area, knew most of the disputants, and was intimately concerned inasmuch as his equipment operators on the United Gas job were not union members. On Tuesday night, November 18, during an informal meeting at the sheriff's office between Everett, Cortez, Trotti and another union official, the union stated that its primary concern was with two crafts, welders and pipe-fitters, and that if the dispute could be settled there would be no further picketing or work stoppages because of the non-union status of Gilco's employees. A second meeting the next morning resulted in an oral agreement between Everett, Gilco and the union which provided that all welders and pipefitters for the United Gas job would be hired through the union's referral system and that all Everett welders who did not reside in the locality (within Local 198's territorial jurisdiction) would be fired. Cortez was told that the non-resident employees would not be given work permits by the union because there were already too many unemployed local people. Haynie discharged Ward on the following day, telling him that Everett was "going to hire Union personnel, and they won't let us let you stay on the job, so we got to fire you." Two other nonunion welders were discharged at about the same time.

Cortez testified that he "thought" the three men thereafter referred by the union to fill the vacancies were union

simply because the agreement was. At least to some extent the Board's decision to overturn the Trial Examiner appears

to have been predicated upon a juridical "fact" that, in an evidentiary sense, was irrelevant.

members, although he was not absolutely certain. However, there is no dispute that one of the welders whose employment was terminated at the behest of the union was replaced by a man who lived in the same town—Eunice, Louisiana.

The only issue raised by Ward's petition for review involves purely and simply a question of fact: was he discharged for the purpose of replacing him with a union member, as found by the Trial Examiner, or for the purpose of replacing him with an area resident, as found by the Board? Of course we are neither required nor authorized to resolve *de novo* this perplexing and frequently evasive question of subject motive or intention, a determination that lies exclusively within the competence of the Board and its fact-finding, experienced-oriented expertise. Our sole function is to decide whether the Board's conclusion regarding the critical issue is supported by substantial evidence in the entire record. Universal Camera Corp. v. N.L.R.B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

■ Obviously, however, on these facts a rejection of the Board's finding regarding the reason for the discharge virtually compels a finding that the discharge was unlawful. None of the respondents could have seriously contended before the Board that some factor *other* than nonresidence or non-membership in the union might have precipitated the termination of Ward's employment,[2] nor could they have successfully argued (without challenging the Examiner's findings of fact) that their conduct did not amount to a § 8 violation. Thus the only problem facing the Board resolved itself into a simple choice between two competing inferences, one of which had to be true. If the Board's choice satisfies the substantial evidence criterion, we must uphold it. On the other hand, "where there is insubstantial support in the record for the Board's inference [regarding the motivation underlying a discharge], we may accord respect for a contrary inference, particularly where, as here such contrary inference was drawn by the Trial Examiner." Southwest Latex Corp. v. N.L.R.B., 5 Cir., 1970, 426 F.2d 50, 57; N.L.R.B. v. Neuhoff Bros. Packers, Inc., 5 Cir., 1968, 398 F.2d 640, 647. In short, in these circumstances we must hold that if the Board was wrong the Examiner must necessarily have been right.[3] It is then a sort of process by reverse osmosis.

The crux of the Board's disagreement with the Examiner lies in its determination that the evidence of a discriminatory, unlawful purpose was insufficient "to rebut the substantial evidence that the Union was very much concerned with the unemployment status of local residents." But the only evidence, substantial or otherwise, regarding the union's beneficent interest in the economic well-being of the community's unemployed welders consisted of testimony by interested parties—Everett, Haynie and Cortez. While the Examiner did not *explicitly* refuse to credit this testimony and the explanation it offered,[4] he obviously regarded it as in-

---

2. Both employers answered the complaint with the defense that Ward had been discharged for refusing to cross the picket line but abandoned this position at the hearing in the face of the uncontroverted testimony that he had been fired at the request of the union.

3. Of course, "once the employer had come forward with evidence to establish the existence of a legitimate motive for discharge, the burden of proving that an improper motivation contributed to that discharge lies upon the General Counsel." N.L.R.B. v. Neuhoff Bros. Packers, Inc., *supra*; N.L.R.B. v. Sutphin, Co.-Atlanta,

Inc., 5 Cir., 1967, 373 F.2d 890, 893. But in the absence of substantial evidence supporting the Board's conclusion, the proof here more than satisfies that burden, and, in fact, compels only one result.

4. Counsel for the Board suggests that credibility determinations played no significant role in the decision and that this is no more than a situation in which the Examiner and the Board drew contrary inferences from undisputed facts. See, e. g., Goodyear Tire & Rubber Co. v. N.L.R.B., 5 Cir. 1972, 456 F.2d 465 [1972, pp. 467, 468]; Corrugated As-

herently improbable, finding that "the Union was interested in jobs for local people only to the extent that such local people were members of the Union within its territorial jurisdiction." This conclusion is simply inconsistent with any suggestion that the Examiner believed the testimonial foundation for the Board's inference that Ward's discharge was the consequence of the union's general interest in the local unemployment situation.

■■ Of course the substantial evidence standard is not modified or eroded merely because the Board has rejected the findings of the Trial Examiner. Halliburton Co. v. N.L.R.B., 5 Cir., 1969, 409 F.2d 496; Southwire Co. v. N.L.R.B., 5 Cir., 1967, 383 F.2d 235; Pratt & Whitney Aircraft Division v. N.L.R.B., 5 Cir., 1962, 310 F.2d 676; N.L.R.B. v. Dell, 5 Cir., 1960, 283 F.2d 733.[5] On the other hand, when the ultimate determination of motive or purpose hinges entirely upon the degree of credibility to be accorded the testimony of interested witnesses, "the credibility findings of the Trial Examiner are entitled to special weight and are not to be easily ignored." Russell-Newman Mnfg. Co. v. N.L.R.B., 5 Cir., 1969, 407 F.2d 247, 249. The preeminence of the Examiner's conclusions regarding testimonial probity does not amount to an inflexible rule that either the Board or a reviewing court must invariably defer to his decision, thereby effectively nullifying either administrative or judicial review. But when the Board second-guesses the Examiner and gives credence to testimony which he has found—either expressly or by implication—to be inherently untrustworthy, the substantiality of that evidence is tenuous at best.[6]

Here the Board's finding that the union's motive in seeking Ward's discharge was to secure employment for local residents rests for the most part, if not entirely, upon such Examiner-discredited testimony. There is no other direct or circumstantial evidence in the record from which that inference could have been drawn.[7] For example, there is nothing to establish the proportion of union to nonunion welders residing within Local 198's territorial jurisdiction, nothing to suggest that the union had ever previously evidenced any concern for unemployed welders generally, and nothing from which to infer that nonmembers were actually the direct or indirect beneficiaries of the union's coercion. Even in the absence of such circumstances the Board has frequently declined to find that a purely coincidental union benefit resulting from a primary concern for craftsmen in a particular geographical area is equivalent to unlaw-

bestos Contractors, Inc. v. N.L.R.B., 5 Cir., 1972, 458 F.2d 683 [1972, p. 687 ; General Truck Drivers Local No. 5 v. N.L.R.B., 5 Cir., 1969, 410 F.2d 1344, 1346, n. 3. This interpretation disregards the fact that the crucial issue underlying the Board's decision—the union's concern or lack of concern for unemployed *nonunion* welders—was very much in dispute and could only have been resolved on this record by believing or disbelieving the testimony regarding it.

5. "We do not require that the examiner's findings be given more weight than in reason and in light of judicial experience they deserve. * * * We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. *The significance of his report, of course, depends largely upon the importance of credibility in the particular case.*" Universal Camera Corp. v. N.L.R.B., *supra*, 340 U.S. at 496, 71 S.Ct. at 456, 95 L.Ed. at 472 (emphasis added).

6. "The Examiner * * * sees the witnesses and hears them testify, while the Board and the reviewing court look only at cold records." N.L.R.B. v. Walton Mnfg. Co., 1962, 369 U.S. 404, 408, 82 S.Ct. 853, 855, 7 L.Ed.2d 829, 832.

7. As we have pointed out (see note 1, *supra*), the facial legality of the union's referral agreement proves nothing one way or the other.

ful discrimination.[8] But all of these decisions are distinguishable from the present one because (i) they did not involve overruling the Trial Examiner on credibility choices related to the issue of motive, or (ii) there was other evidence in the record, apart from that rejected by the Examiner, to support a finding of a lawful motive or (iii) viewed simply as a problem involving the burden of proof (see note 3, *supra*) the evidence was insufficient to prove an unlawful motive. Here the Board inferred a lawful motive—a desire to promote local, rather than union, employment— but only by crediting testimony which was implicitly rejected by the Examiner.

We conclude that under the circumstances the Examiner's credibility determinations must prevail, as they have in many of our previous decisions. See, e. g., N.L.R.B. v. Big Three Industrial Gas & Equipment Co., 5 Cir., 1971, 441 F.2d 774, 778; Dryden Mnfg. Co. v. N.L.R.B., 5 Cir. 1970, 421 F.2d 267, 270; Dobbs Houses, Inc. v. N.L.R.B., 5 Cir., 1963, 325 F.2d 531, 537; N.L.R.B. v. Georgia Rug Mill, 5 Cir. 1962, 308 F. 2d 89. If there were some other evidentiary basis for the Board's inference of a lawful purpose, a different result might follow. But given the inherent incredibility of the employers' testimony regarding the union's purported reason for seeking Ward's discharge, and its rejection by the Examiner, we cannot find that it constituted substantial evidence supporting the Board's conclusion.

Nor can we agree with the contention that the Examiner's decision was supported only by "suspicion." Obviously conjecture and speculation cannot substitute for proof. N.L.R.B. v. Mac Smith Garment Co., 5 Cir., 1953, 203 F. 2d 868, 871. But it is equally axiomatic that in resolving two conflicting hypotheses the Examiner may draw upon his own experience and common sense in the assessment of their respective probabilities. Radio Officers' Union v. N.L. R.B., 1954, 347 U.S. 17, 49, 74 S.Ct. 323, 340, 98 L.Ed. 455, 482. That experience, the product of long and intimate familiarity with similar disputes, might properly have led the Examiner to believe that labor unions are ordinarily concerned most with promoting the economic self-interest of their own members, not with cultivating a community reputation for altruism by taking concerted action on behalf of those in its trade or craft who for one reason or another have declined to join. Certainly a 60-man picket line commandeered by a union representative suggested something more than simple eagerness to assist a local resident in need of a job. When an impartial Examiner refuses to credit self-serving assertions that union membership was merely coincidental, then reaches a contrary decision on the basis of facts in the record,[9] that result is the product of something more substantial than abstract theorizing. In this case, at least, it is also the only result which the evidence permits.

8. E. g., Huxtable-Hammond Co., 1969, 174 NLRB 197; International Union of Operating Engineers, Local No. 98, 1965, 155 NLRB 850; Local 542, International Union of Operating Engineers, 1965, 151 NLRB 497; Park Construction Co., 1965, 150 NLRB 1496; Local 369, International Hod Carriers, 1964, 147 NLRB 1209; Local Union No. 337, Plumbers and Pipefitters, 1964, 147 NLRB 929; Laborers and Hod Carriers Union, Local 652, 1962, 135 NLRB 43; Plaza Builders, Inc., 1961, 134 NLRB 751.

9. Without attempting an exhaustive analysis of the evidence, we simply point out that in our opinion the following findings, not disapproved by the Board, mandate the decision reached by the Examiner: (i) Trotti asked Haynie whether the work had been bid in as a union job, rather than whether Everett was employing local or nonresident labor, (ii) Trotti declined Haynie's offer to employ available local labor without an exclusive referral agreement, (iii) Haynie asked Ward whether he or any of the other men had a union book, (iv) Ward was told he was being discharged because the company was going to hire union personnel, (v) three non-union employees were replaced by workers found inferentially by the Examiner to have been union members one of whom lived in the same town as the man he replaced.

The petition for review is granted. The order of the Board is vacated and the case remanded for further proceedings consistent with this opinion and with the original findings and decision of the Trial Examiner.

Vacated and remanded.