NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

GOLD STANDARD ENTERPRISES,
INC., et al., Respondent.

No. 78–2367.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 24, 1979.

Decided Oct. 31, 1979.

Rehearing and Rehearing En Banc
Denied Dec. 3, 1979.

Joseph Ferrara, N.L.R.B., Washington, D. C., for petitioner.

David W. Adelman, Chicago, Ill., for respondent.

Before SWYGERT, PELL and BAUER, Circuit Judges.

PELL, Circuit Judge.

This case is before the court on the application of the National Labor Relations Board (Board) for enforcement of its order issued on February 1, 1978, against Gold Standard Enterprises, Inc., Gold Standard Liquor Store at Ridge Avenue, Chalet Wine and Cheese Shops Ltd. at Fullerton Avenue, and Chalet Wine and Cheese Shops, Ltd. at Highland Park (Gold Standard). The Board's Decision and Order is reported at 234 NLRB No. 64 (1978).

Because some developments occurring during the course of litigation were not brought to the attention of the panel hearing oral argument in this case until that argument was well advanced, which developments we regard, upon consideration, as dispositive of this case, we will set out those particular matters herein.

Before doing so, we will mention other matters which *were* brought to the attention of the court by the briefs filed by the parties or the appendix filed by the Board. A hearing was held on the General Counsel's complaint before an Administrative Law Judge (ALJ) on March 28 and 29, 1977. After setting forth the statement of the case and findings of fact, the ALJ concluded as a matter of law that Gold Standard had not engaged in unfair labor practices within the meaning of Section 8(a)(4), (3) and (1) of the Act and accordingly dismissed the complaint in its entirety. The Board in its Decision and Order by a 2 to 1 decision declined to agree with the disposition by the ALJ and found as a matter of law that the unfair labor practices as charged in the complaint had been committed by Gold Standard. The Board order was in part to cease and desist certain unfair labor practices (the negative portion of the order) and in part to take certain affirmative action. The negative and affirmative aspects are succinctly summarized in the notice to employees which Gold Standard was required to post at its places of employment:

WE WILL NOT threaten our employees that they or others will suffer bodily harm because of their union or other protected concerted activities.

WE WILL NOT discriminate against our employees by discharging and failing to reinstate them or failing to transfer them because of their union activities.

WE WILL NOT discriminate against our employees because they filed unfair labor practice charges with the National Labor Relations Board.

WE WILL NOT in any other manner interfere with, restrain, or coerce our employees in the exercise of their rights under Section 7 of the National Labor Relations Act.

WE WILL offer Helen Alcantar immediate and full reinstatement to her former job or, if that job no longer exists, to a substantially equivalent position without prejudice to her seniority or other rights or privileges.

WE WILL make Helen Alcantar whole for any loss of earnings or other benefits she suffered as a result of the discrimination against her, together with interest.

WE WILL offer Billie Van Wieren immediate transfer to the position to which she requested transfer at our Fullerton Avenue Chalet in Chicago, Illinois, displacing, if necessary, any employee assigned to or working in that position since the date of her request, and we shall reimburse her for any travel expenses incurred by reason of our unlawful refusal to transfer her plus interest.

Board Member Murphy, dissenting, agreed with the ALJ that Gold Standard did not violate the Act as alleged, pointing out that the ALJ had made his finding upon the entire record from his observation of the witnesses and that unless the preponderance of the evidence on the record clearly undermined those findings the Board should not disturb them. She also pointed out that the Board had always been reluctant to reverse an ALJ's credibility resolutions, especially where such resolutions were based on the demeanor of the witnesses. One of the principal bases for the majority, according to Member Murphy, in not accepting the credibility determination of the ALJ was that the ALJ had omitted any reference to the testimony of two employees which the majority termed as being uncontradicted. Member Murphy observed that in her opinion it was implicit in the ALJ's general statement regarding credibility that he had discredited the testimony of any witnesses to the extent such testimony conflicted with the facts as described by the witnesses whom he had credited.

The present case was initiated in this court on October 26, 1978, by the Board filing its application for "enforcing in whole said order [of February 1, 1978] of the Board, and requiring [Gold Standard] to comply therewith." That something less than the "whole said order" was that which the Board sought to have this court enforce was not reflected in the briefs of the parties filed in the present case other than in the Board's brief, a final footnote contained the following unexplained reference, "Any company argument that the case is moot because of technical compliance fails in the face of the settled principle that Board orders impose a continuing obligation barring any resumption of unfair labor practices." Gold Standard's brief filed in this case contained no contention regarding compliance, technical or otherwise, but addressed itself to the merits of the February 1978 order.

It was not until oral argument by counsel for Gold Standard that it was brought to the attention of the panel that there had been a prior application for enforcement of the February 1978 order which application had been dismissed. Pursuit of this matter at oral argument and subsequent examination of the files of this court developed that on April 27, 1978, an application for enforcement of the order of February 1, 1978, was filed in this court, No. 78–1543, which application was substantially identical to the present application filed on October 26, 1978. An answer to the first application was in due course filed on behalf of Gold Standard on May 16, 1978. On May 26, 1978, the Board filed its motion to withdraw without prejudice its application for enforcement stating in the motion that Gold Standard was "complying with the Board's order in a manner satisfactory to the Board, thus dispensing with the necessity of further litigation at this time." The application was dismissed by the court on June 7, 1978, without prejudice.

On February 2, 1979, Gold Standard filed a motion to dismiss in the present case, No. 78–2367, on the basis that all matters of the Decision and Order of February 1, 1978, had been complied with by Gold Standard. The Board filed objections to this motion on the basis that subsequent to the court's dismissal of the first application, new unfair labor practice charges in Board cases, No. 13–CA–17811 and 13–CB–8021 were filed against Gold Standard and a union. It appears from the objections filed that the union party was one which was being recognized by Gold Standard although it did not represent a majority of its employees. Although there was reference to a "sweetheart contract" in the Board's February 1 order under review, the union which was made a party in the new unfair labor practice proceedings was not the union of which the discharged employees were members, and the February 1, 1978, order does not appear to be, directly at least, concerned with any unfair labor practice charge arising out of Gold Standard's recognition of a union not representing a majority of its employees. The motion to dismiss was denied by this court and a briefing schedule was set up with some extensions being granted during a time that it appeared settlement negotiations were underway.

It was also developed from oral argument discussion of this matter, and from files of this court, that Gold Standard had complied with the affirmative aspects of the February 1, 1978, order, relating to the two specifically mentioned employees. The Board's position at oral argument was that the dismissal was "without prejudice" and that the Board had an undoubted right to pursue the negative aspects of its original order on the cease and desist matter when further or new unfair labor practices had been committed. There was no explication, however, as to why the Board in its second application did not narrow this just to those matters as to which there had not been compliance. It was also developed that there had been a full evidentiary hearing on the new unfair labor practices which had been charged in the complaint and that a decision adverse to the company had been rendered by the ALJ.

We, of course, are not unmindful that presumptively the members of this court are acquainted with all of the records of this court. However, as a practical matter, with the great volume of cases filed in this court such a presumption of knowledge is unreal in the absence of the parties' request that such notice be taken. In preparing for oral argument, reading six sets of briefs for one day of arguments leaves little time for searching the records and files for points not raised.

In the context of this background information, we now reach the point of determining whether we should also reach the merits of the issue of enforcing the allegedly still viable parts of the Board's order of February 1, 1978. If we reach the merits, we will have to decide whether the Board's order to cease and desist is supported by substantial evidence on the whole record. The situation we have here of the Board disagreeing with the factual determinations of the ALJ has been addressed in a number of judicial decisions which unfortunately have not resulted in clear guidelines easy of application. We nevertheless will look at judicial and Board decisions on the general standard of review, some of which address the specific situation before us in which the Board has rejected the findings of fact of the ALJ.

The customarily cited and often-quoted case in this area is *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951) in which the Court, after noting Congressional regard for the ALJs' [then examiners'] decisions, particularly when material facts depend on the determination of credibility of witnesses as shown by their demeanor or conduct at the hearing, then stated:

We do not require that the examiner's findings be given more weight than in reason and in the light of judicial experience they deserve. The "substantial evidence" standard is not modified in any way when the Board and its examiner disagree. We intend only to recognize

that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. The significance of his report, of course, depends largely on the importance of credibility in the particular case.

340 U.S. at 496, 71 S.Ct. at 469. The Board itself stated in a pre-*Universal Camera* case that in all cases coming before the Board, it based its findings as to the facts upon a *de novo* review of the entire record and did not deem itself bound by the Trial Examiner's findings, but that "[n]evertheless, as the demeanor of witnesses is a factor of consequence in resolving issues of credibility, and as the Trial Examiner, but not the Board, has had the advantage of observing the witnesses while they testified, it is our policy to attach great weight to a Trial Examiner's credibility findings insofar as they are based on demeanor." [Footnotes omitted]. *Standard Dry Wall Products, Inc.*, 91 NLRB 544, 545 (1950), enfd., 188 F.2d 362 (3rd Cir. 1951).

We note other judicial observations on the subject. Although some weight must be given to the Examiner's findings, it does not mean that an Examiner's findings on veracity must not be overruled without a very substantial preponderance of the evidence or, in other words, the Board will not be held to a clearly erroneous standard in rejecting an Examiner's findings. *NLRB v. Interboro Contractors Inc.*, 388 F.2d 495, 499 (2nd Cir. 1967). There is no need for citation of authorities, of course, for the general rule that when findings are based upon credibility and the ALJ and the Board are in agreement as to those findings, the findings will be regarded by the courts as being supported by substantial evidence even though the court might have reached a different finding on the conflicting facts.

We are not here concerned, of course, with the situation where credibility is *not* involved. In that situation, as the court pointed out in *NLRB v. Pacific Grinding Wheel Co., Inc.*, 572 F.2d 1343, 1347 (9th Cir. 1978), the Board is free to draw its own inferences from the evidence and if the Board can point to evidence which supports those inferences, the Board's finding will be allowed to stand by the courts despite the fact that the ALJ interpreted the facts contrary to the inferences drawn by the Board. In *NLRB v. Florida Medical Center Inc.*, 576 F.2d 666, 674 (5th Cir. 1978), the court pointed out that when the Board does not accept the findings of the ALJ, the reviewing court has an obligation to examine the evidence and findings of the Board more critically than it would if the Board and the ALJ were in agreement. In that case, apparently the court did not have a situation based upon credibility determinations by the ALJ. The court indicated, however, that because of the divergent views of evidentiary facts held by the Board and the ALJ, the court was required to pay particular attention to the record. Applying that standard the court held that the inference drawn by the Board was not supported by substantial evidence.

With reference to the precise issue now under discussion, that of a divergent finding of fact by the Board from that found by the ALJ, who has purported at least to rest his or her findings on credibility determinations, the most recent and most extended discussion and analysis in a court opinion which has come to our attention is that by Judge Wallace in *Penasquitos Village Inc. v. NLRB*, 565 F.2d 1074 (9th Cir. 1977). After tracing and analyzing various pertinent cases, Judge Wallace drew a distinction between credibility determinations based on demeanor, sometimes referred to as testimonial inferences, and inferences drawn from the evidence itself, sometimes referred to as derivative inferences. *Id.* at 1078. Judge Wallace's analysis is persuasive and would provide more specific guidelines than those generally available in the case law. The judge also emphasized that the court was not holding that the

ALJ's determinations of credibility based on demeanor would be conclusive on the Board. *Id.* at 1079. Unfortunately, however, we are unable to take the distinction, referred to by Judge Duniway in his concurrence and dissent as a dichotomy between credibility determinations and those based on inferences drawn from the evidence itself, as the law of the Ninth Circuit because both of the other judges on the panel had reservations about the rationale by which the result was reached. The court majority did deny enforcement of the Board's order, although Judge Duniway would have enforced in part. *Id.* at 1087. The other members of the panel primarily questioned the validity of Judge Wallace's analysis of the aspects of a witness' demeanor, *id.* at 1078–79, Judge Duniway venturing to suggest that as to every one of the factors that Judge Wallace listed, one trier of fact might take it to indicate that the witness was truthful and another might think that the witness was lying. *Id.* at 1084. It may well be as Judge Duniway concludes, as did Judge Lumbard earlier in *Interboro Contractors, Inc., supra,* that although the standard set forth in *Universal Camera* is imprecise it provides as much clarity as the area affords. *Id.* at 1087.

In any event, the cases analyzed in Judge Wallace's portion of the court's opinion are helpful in implementing *Universal Camera's* general guidance. We do not read the opinions of the other two judges as being in disagreement with the summary of the cases which led Judge Wallace to his ultimate distinction between testimonial inferences and derivative inferences. We particularly note that Judge Wallace had found no decision nor had one been cited to the Ninth Circuit, and indeed none has been cited to us, which sustained a finding of fact by the Board which rested "*solely* on testimonial evidence discredited either expressly or by clear implication" of the Administrative Law Judge. [Emphasis in the original.] *Id.* at 1076.

Judge Wallace's portion of the court's opinion also referred to the case of *Ward v. NLRB,* 462 F.2d 8 (5th Cir. 1972), in which the Fifth Circuit reinstated the Trial Examiner's decision and in which case, by clear implication, the Trial Examiner discredited that testimony and found against the union.

As we read the Board's opinion and Member Murphy's dissent in the present case, a key factor is disagreement as to whether the ALJ had by implication discredited the testimony of the two witnesses that the majority treated as uncontradicted. Both the majority and Member Murphy rely upon *Electri-Flex Co.,* 228 NLRB No. 79, at 847 *modified* 570 F.2d 1327 (7th Cir. 1978), *cert. denied,* 439 U.S. 911, 99 S.Ct. 280, 58 L.Ed.2d 256. We would be inclined, if it became crucial, to lean toward the position adopted by Member Murphy and find that the majority was in effect creating a precedent, or rather asking us to do so, by sustaining findings of fact by the Board which rested almost solely on testimonial evidence discredited either expressly or by clear implication by the ALJ.

Upon our consideration of the case as it now appears, after oral argument, we do not think it is necessary for us to endeavor to untie the knotty merits problem. Instead we think that enforcement of the February 1, 1978, order should be denied for other reasons. We say "other reasons" even though one aspect of the totality of circumstances before us is the very closeness of the issue which the Board would have us decide on the merits. In reaching our decision not to enforce, we note that this is not a case where the Board has dismissed a first application for enforcement on the belief there would be compliance and then has found that there was no compliance with either the affirmative or the negative aspects of the order. If, for example, there had been a second application in which it was asserted that the discharged employee had not received backpay as ordered by the Board, there would be strong reasons for seeing that the employee in question promptly received the pay if in law she was entitled to it. These affirmative aspects, however, concededly are not involved in the second application for enforcement. If we were to determine that the Board order required enforcement not-

withstanding its disagreement with the ALJ's determination we would be enforcing generalized language prohibiting Gold Standard from taking certain specific action with regard to their employees and their union activities and in other manners interfering with, restraining, or coercing its employees in the exercise of rights guaranteed them by Section 7 of the Act. Enforcement of this order would primarily be of significance with regard to activities of Gold Standard claimed to be unfair labor practices occurring subsequent to our order of enforcement. Ultimately the significance would come into focus in a contempt proceeding which would be brought back before this court. It is extremely unlikely that this court itself would engage in an extended evidentiary hearing to determine whether subsequent acts which the Board might contend were a violation of its February 1, 1978, cease and desist order did indeed constitute a violation of that order.

This court could no doubt readily ascertain without an extended evidentiary hearing whether a company had complied with an enforced affirmative order to rehire or pay back wages. Those issues, however, are out of the case and a determination of whether Gold Standard had complied with the generalized cease and desist aspects of the order would have to be referred to a master to conduct the appropriate evidentiary hearing. From our experience in such matters a final resolution in this context would not be reached at an early time.

As Gold Standard's labor relations picture appears at this time, they have been on a preliminary basis, following a full evidentiary hearing, found to have committed subsequent unfair labor practices. If the Board should not rule the same way, then the very activity which has precipitated this second application for enforcement would be of no validity, thus in effect indicating that the second application for enforcement should not have been filed. We have no reason at this time for thinking that if the Board should concur in the result reached by the ALJ in the proceeding recently conducted that Gold Standard might not decide

that the time had come to endeavor voluntarily to reach a status of full compliance. If not, we very probably would have a case for enforcement before us based upon a clear and unambiguous record. In essence, it appears that the present case amounts to an endeavor to have the court put additional pressure on Gold Standard in connection with the more recent unfair labor practice case which is now, as we understand it, before the Board. In view of the arguably infirm basis of the merits of the present proceeding, we decline to take the action sought.

Upon consideration of all of the aspects of this case, we think it proper to deny enforcement of the February 1, 1978, order, and accordingly do so.

ENFORCEMENT DENIED.