**Edward KOPACK, Sr. and Edward Kopack, Jr., Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**and**

**Vogt-Conant Co., Intervenor-Respondent.**

**No. 80–1783.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 26, 1981.

Decided Jan. 15, 1982.

Certiorari Denied May 24, 1982. See 102 S.Ct. 2278.

Larry Sanders, Law Student, Notre Dame, Ind., for petitioners.

James D. Donathen, Elliott Moore, N.L.R.B., Washington, D. C., for respondent.

Before PELL and CUDAHY, Circuit Judges, and CAMPBELL,* Senior District Judge.

PELL, Circuit Judge.

Edward Kopack, Sr. and Edward Kopack, Jr. petition for review of an order of the National Labor Relations Board (NLRB or Board) dismissing certain allegations of a complaint they filed against Vogt-Conant Co. (Company). On March 17, 1980, the NLRB found the evidence insufficient to conclude that the Company dismissed Kopack Jr. and Kopack Sr. in retaliation for the son's complaints about lack of overtime pay.

Overruling the decision of the Administrative Law Judge (ALJ), the Board found the discharges not in violation of sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (3) (1976) (Act). At issue in this petition is whether there is substantial evidence in the record as a whole to support the conclusion of the Board. Critical to the question is the determination to what extent the ALJ re-

---

* The Honorable William J. Campbell, Senior District Judge for the Northern District of Illinois, is sitting by designation.

lied on witness "credibility," as that term was used by the Supreme Court in *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496, 71 S.Ct. 456, 468, 95 L.Ed. 456 (1951).

## I. FACTS

Vogt-Conant Co. was under contract to Inland Steel Co. (Inland) to perform maintenance and construction work at Inland's East Chicago facility. Charles Cowles, the job superintendent, was the highest ranking Company official at the site. Raymond Chandler was his assistant. Inland's field force engineers oversaw the Company's operations on Inland's premises.

### A. Kopack Jr.'s Work Performance

Kopack Jr. was hired by Cowles as a truckdriver at the Inland site in 1973. He had previously worked for Cowles at another company and the two had become friends. In 1976, Cowles gave Kopack Jr. a raise of twenty-five cents per hour above union scale because Kopack Jr. performed additional duties such as helping coordinate work and keeping Cowles advised as to the condition of equipment.

One of Kopack Jr.'s regular duties was to drive employees from the parking lot to the worksites in a company bus. During 1976 and 1977, employees complained to the foremen and union stewards about Kopack's driving. They claimed that he speeded, ran stop signs, and tried to beat trains across intersections. Most of the complaints were communicated to Chandler, who then reprimanded Kopack Jr. During the same period, Inland complained on three occasions about Kopack Jr.'s driving. Kopack Jr. received tickets from Inland personnel for speeding and passing a bus while it was unloading passengers. He was also observed by an Inland official going through a stop sign. On each occasion, Cowles told Kopack Jr. that he would have to obey Inland's traffic regulations.

The Company presented evidence that, in 1978, Inland complained about Kopack Jr.'s driving five times in five months. Of particular importance is an incident that occurred on January 11, 1978. Dick Wisnew-

ski, Inland's assistant supervisor of field forces, saw Kopack Jr. driving the Company bus the wrong way on a one-way street at a high rate of speed. Following this incident, Wisnewski talked to both Cowles and Chandler, telling Cowles that if his drivers could not obey the traffic regulations, he should get new drivers. Wisnewski had the authority to cancel Inland's contract with the Company. Cowles testified that he reprimanded Kopack Jr., who assured him that the incident would not be repeated. Kopack Jr. testified that he did not remember Cowles' telling him of Wisnewski's anger over the infraction. He also claimed that it was Wisnewski who had been going the wrong way. Both the ALJ and the Board discredited Kopack Jr.'s testimony on this point.

Inland complained about Kopack Jr.'s driving twice during February, 1978, and once in late April. On May 9, 1978, Joe Ladd, an Inland field force engineer met with Cowles. He reported that Kopack Jr. had nearly caused an accident and asked Cowles to get a different driver for the area supervised by Ladd. Cowles then discussed the incident with Chandler, implying that Cowles' friendship with Kopack Jr. should not keep Chandler from discharging Kopack Jr. if the reckless driving continued.

On June 1, 1978, Chandler saw Kopack Jr. speeding and, according to Chandler's testimony, warned him that continued reckless driving could lead to discharge. Kopack Jr. remembered discussion of the infraction but not the warning. He further claimed that he had not been speeding. The ALJ did not resolve this conflict in testimony. On June 7, 1978, Chandler again saw Kopack Jr. speeding and failing to stop at stop signs. At the end of the day's shift, Chandler discharged Kopack Jr. According to Chandler, Kopack Jr. did not protest the dismissal; he did not even ask Chandler to explain his reasons therefor. Kopack Jr. however claimed that he did ask whether he was being fired or laid off and Chandler replied that he did not want to discuss it. The ALJ's decision implies that he credited Kopack Jr.'s testimony over that of Chandler

insofar as Kopack Jr. contended that he questioned Chandler. The ALJ did not refer to the demeanor of either witness in this portion of his opinion. As Kopack Jr. left the site, he saw Cowles, who was apparently unaware of the discharge. Kopack Jr. shook hands with Cowles but did not mention his termination.

### B. Kopack Jr.'s Concern About Bus Time

In April, 1978, the Company made two changes which affected Kopack Jr.'s earnings. Company vice-president Graves ordered that Kopack Jr. be paid no more than the union scale. During the previous year, Kopack Jr. had stopped performing the additional duties which had resulted in the premium pay. After Kopack Jr. complained to both Cowles and Graves, the premium pay was restored. During the same month, the Company quit paying drivers who operated the Company bus at the beginning and end of a twelve-hour shift for the extra time their duties required. This change was made because Inland interpreted the collective-bargaining agreement as not requiring the extra pay. Kopack Jr. also discussed this change with both Graves and Cowles. Graves told him that Inland's interpretation was binding because Inland paid the Company on a cost-plus basis.

Kopack Jr. then complained to the union about the loss of bus time. Tyrka, the union business agent, disagreed with Kopack Jr.'s interpretation of the collective bargaining agreement. Tyrka told Kopack Jr. that if he did not like the job he should quit. Because Kopack Jr. still was not convinced, Cowles invited Tyrka to the job site on May 15, 1978. Tyrka said that the Company and Inland were correct and, further, that Kopack Jr. should not be receiving the twenty-five cents per hour above union scale. The Company nonetheless continued the premium pay. Kopack Jr. still was not satisfied but Cowles refused to pay the drivers for bus time unless Kopack Jr. obtained from Inland a written guarantee

that Inland would reimburse the Company. According to Kopack Jr.'s testimony, a day or two later, he complained to Chandler about the bus time. Chandler allegedly told him to "shut his mouth" about bus time unless he wanted Cowles and Tyrka to get rid of him. After this conversation in mid-May, Kopack Jr. did not complain again about bus time. Chandler testified that he did not think Kopack Jr. talked to him about bus time after May 15, 1978, when the meeting with Tyrka was held. Chandler denied having told Kopack Jr. to keep his mouth shut. The ALJ credited Kopack Jr. on this point and the Board adopted the ALJ's finding.

### C. Kopack Sr.

Kopack Sr. began working for the Company in August, 1977, as a truck driver. He had twenty-five years experience as a driver. Kopack Sr. drove a variety of trucks for the Company, driving a semi-tractor about twenty-five percent of the time. Occasionally he was laid off for lack of work.

On June 6, 1978,[1] Kopack Sr. was assigned to a semi-tractor with a large flatbed trailer. He had difficulty backing the trailer into a narrow space. Gerald Coffey, the Company's ironworker foreman, was upset at the length of time it took Kopack Sr. to complete the backing operation. That afternoon Coffey told Chandler that he would prefer a driver other than Kopack Sr. At the end of the shift, Chandler laid off Kopack Sr., telling him that he had no more work for him but that his previous work had been good. Chandler had been informed, however, of a new job to begin just a few days later. A new driver had been hired the day before Kopack Sr. was laid off and on July 26, 1978, a second new driver was hired. Kopack Sr. was not recalled.[2]

### D. Proceedings Below

Kopack Jr. filed an unfair labor practice charge against the Company on June 8,

---

1. The Respondent's brief states that Kopack Sr. was discharged on June 5, 1978. This is inconsistent with the transcript of proceedings before the ALJ.

2. Because Kopack Sr. was not recalled, we will refer to the events of June 5, 1978, as constituting a "discharge" rather than a "layoff."

1978. Kopack Sr. filed a similar charge three days later. A consolidated complaint was issued on July 21, 1978, alleging that the discharges were violative of sections 8(a)(1) and 8(a)(3). Additionally, the complaint alleged that several threats were made to Kopack Sr. in violation of section 8(a)(1).

After a two-day hearing, the ALJ found that Chandler violated section 8(a)(1) when he told Kopack to "shut his mouth" about bus time unless he wanted to be fired. The ALJ also found that the Company's reasons for the discharges were pretextual. In the view of the ALJ, the Company had tolerated Kopack Jr.'s reckless driving habits so long that its "sudden concern" with his recklessness was not persuasive as the explanation for his discharge. According to the ALJ, the real reason for the discharge was Kopack Jr.'s complaints about the loss of bus time. Similarly, Kopack Sr. was discharged in retaliation for his son's protected activity.

The Board affirmed the single section 8(a)(1) violation, noting that the ALJ had relied primarily on demeanor in reaching his conclusion. The Board, however, found that Kopack Jr.'s reckless driving, rather than his protected activity, was the cause of his discharge. The Board found a lack of the requisite union animus in both discharges and therefore declined to find the Company's actions violative of the Act.

## II. DISCUSSION

### A. The Standard

In reviewing an NLRB decision, we must accept the Board's findings of fact as conclusive if they are "supported by substantial evidence on the record as a whole." 29 U.S.C. § 160(e) (1976).[3] In applying this standard, we must "tak[e] into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). The Supreme Court has discussed the impact on that standard of a disagreement between the ALJ and the Board:

> The "substantial evidence" standard is not modified in any way when the Board and its examiner disagree. We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witness and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. The significance of his report, of course, depends largely on the importance of credibility in the particular case.

*Id.* at 496, 71 S.Ct. at 468.

This court recently analyzed the above-quoted passage from *Universal Camera* in *NLRB v. Gold Standard Enterprises, Inc.*, 607 F.2d 1208, 1210–12 (7th Cir. 1979). In that case we concluded that "although the standard set forth in *Universal Camera* is imprecise it provides as much clarity as the area affords." *Id.* at 1212 (citation omitted); *accord, Penasquitos Village, Inc. v. NLRB*, 565 F.2d 1074, 1087 (9th Cir. 1977) (Duniway, J., dissenting); *NLRB v. Inter-*

---

**3.** The Company urges us to uphold the Board's decision in this case if the record "offers a rational basis for the Board's conclusion." The "rational basis" standard has been applied by the District of Columbia and Ninth Circuits in cases wherein the Board found in favor of the employer. *Distributive Workers of America v. NLRB*, 593 F.2d 1155, 1164 (D.C.Cir.1978) (citation omitted); *Chamber of Commerce of United States ex rel. Boise Cascade Corp. v. NLRB*, 574 F.2d 457, 463 (9th Cir. 1978) (citation omitted), *cert. denied*, 439 U.S. 981, 99 S.Ct. 569, 58 L.Ed.2d 652. This court has not adopted the rational basis standard in any opinion which serves as precedent in this circuit. Because it is not essential to our disposition of such a departure from the substantial evidence test at this time. We do note, however, that this court has interpreted the substantial evidence test as requiring " 'such evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Nacker Packing Co. v. NLRB*, 615 F.2d 456, 459 (7th Cir. 1980) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–90, 71 S.Ct. 456, 464–66, 95 L.Ed. 456 (1951)).

*boro Contractors, Inc.*, 388 F.2d 495, 499 (2d Cir. 1967). Nonetheless, the arguments presented by counsel in the instant case, regarding the meaning of "credibility" as used by the Supreme Court in *Universal Camera*, require us to develop further the analysis we began in *Gold Standard Enterprises.*

Before we attempt to elucidate the meaning of "credibility," however, we must address an argument made by the petitioners which, in our view, clearly misstates the applicable law. In their brief, the petitioners quote from Judge Learned Hand, *on remand*, in *Universal Camera*, the proposition that "an examiner's finding on veracity must not be overruled without a very substantial preponderance in the testimony as recorded." 190 F.2d 429, 430 (2d Cir. 1951). They then state that "the record as a whole in this manner contained substantial evidence to support Petitioners' allegation that they were unlawfully discharged in violation of the Act." Apparently the petitioners' argument is that the Board erred in overruling the ALJ because the ALJ's contentions were supported by substantial evidence, and therefore the Board is subject to reversal by this court.

The applicability of the standard stated by Judge Hand is, however, precluded by *FCC v. Allentown Broadcasting Corp.*, 349 U.S. 358, 75 S.Ct. 855, 99 L.Ed. 1147 (1955). In *Allentown Broadcasting*, the hearing examiner had found Easton's principal witness evasive in response to questions about radio network affiliation. The Commission nonetheless granted the license to Easton. The District of Columbia Circuit held that the Examiner's finding regarding the witness' evasive demeanor could not be overruled by the Board without a very substantial preponderance in the testimony as recorded. Applying this standard, the court found that the Commission had erred and set aside its order granting the license to Easton. The Supreme Court reversed, holding that the "substantial preponderance" standard was inconsistent with the responsibility for decision placed on the Commission. *Id.* at 364, 75 S.Ct. at 859. The *Allentown Broadcasting* Court relied on

language from the Supreme Court resolution in *Universal Camera* in stating its holding.

■ Framing the issue on review as being "whether the Board erred" is inconsistent with *Universal Camera.* That case establishes the level of scrutiny which must be applied to a Board decision by a reviewing court. It does not address what, if any, standard of review the Board must apply to an ALJ's determination. It is not the case that the Board must observe the same standard as a court of appeals: "[I]n reviewing questions of fact, a court of appeals has less discretion to overturn an NLRB determination than the NLRB has to reject conclusions of its administrative law judge. '[T]he Board is not bound by findings and conclusions of an administrative law judge and is free to draw its own inferences as well as conclusions when its broader experience and expertise is applicable.' " *U.S. Soil Conditioning v. NLRB*, 606 F.2d 940, 944 (10th Cir. 1979) (citations omitted). Asking whether the Board "erred" therefore is not only outside the scope of the *Universal Camera* decision; framing the issue in such a manner adds confusion to an area where clear analysis is already difficult. The sole issue before this court is whether there is "substantial evidence" to support the Board's determination.

■ It is possible that we misconstrue the petitioners' argument and that they contend *this court* is bound to uphold the ALJ's findings because they are supported by substantial evidence. This argument also misstates the law. *Universal Camera* makes clear that it is the Board's decision, rather than that of the ALJ, which is subject to scrutiny by a reviewing court under the substantial evidence test. 340 U.S. at 488, 71 S.Ct. at 464. As the Ninth Circuit stated in *NLRB v. Pacific Grinding Wheel Co.*, 572 F.2d 1343 (9th Cir. 1978), "if there is evidence to support each of two conflicting views, the findings of the Board must be allowed to stand despite the fact that we might have reached the opposite conclusion on our own." *Id.* at 1347 (citations omitted).

We now turn our attention to the ambiguity in *Universal Camera* with which courts have most frequently grappled: the range of meaning connoted by the term "credibility." Arguably, credibility is at issue in virtually every case, or at least in any case involving testimonial evidence. When an ALJ decides, from the whole of the record, that one side has made the more persuasive argument, he is concluding that that party is the more "credible." As the petitioners maintain, the ALJ's determination in the case at bar that the Company's justifications for the discharges were pretextual are, in this sense, credibility determinations.

■ "Credibility" has a much narrower meaning, however, if it is interpreted as synonymous to witness demeanor. Demeanor is often a major factor in an ALJ's decision to credit the testimony of one witness over that of another when the two present conflicting views of the same event. One must attribute significant weight to an ALJ's findings based on demeanor because neither the Board nor the reviewing court has the opportunity similarly to observe the testifying witnesses. In a pre-*Universal Camera* case, the Board itself stated that:

> as the demeanor of witnesses is a factor of consequence in resolving issues of credibility, and as the Trial Examiner, but not the Board, has had the advantage of observing the witnesses while they testified, it is our policy to attach great weight to a Trial Examiner's credibility findings insofar as they are based on demeanor.

*Standard Dry Wall Products, Inc.*, 91 NLRB 544, 545 (1950), *enfd.*, 188 F.2d 362 (3d Cir. 1951) (per curiam).

■ In *Gold Standard Enterprises*, this court discussed in some detail the analysis of "credibility" articulated by Judge Wallace in *Penasquitos Village, Inc. v. NLRB*, 565 F.2d 1074 (9th Cir. 1977). Judge Wallace drew a distinction between "testimonial inferences" and "derivative inferences." A testimonial inference is one based on demeanor. A derivative inference, on the other hand, is one drawn from the evidentiary facts themselves. By using this terminology, Judge Wallace sought to clarify the meaning of "credibility" as used by the Supreme Court in *Universal Camera*. He concluded that the term referred to testimonial inferences only. *Id.* at 1078–79. We concur with Judge Wallace's conclusion that the *Universal Camera* Court was referring to witness demeanor when it used the term "credibility."

If one were to interpret "credibility" broadly, to include what Judge Wallace termed "derivative inferences," credibility would be critical to virtually every decision reached by an ALJ. Such a result is not consistent with *Universal Camera*. Prior to its reference to credibility, the *Universal Camera* Court directed a reviewing court to consider the "findings" of the examiner in determining whether the Board decision is supported by substantial evidence. Embodied in those findings are the ALJ's derivative inferences. If credibility is more significant in some cases than in others, as *Universal Camera* implies, the term must have a more limited meaning.[4]

As we previously noted in *Gold Standard Enterprises*, Judge Wallace's opinion does not represent the law of the Ninth Circuit. 607 F.2d at 1212. Both Judge Duniway and Judge Choy, the other two panel members, questioned the rationale employed by Judge Wallace.[5] Judge Duniway expressed concern with the "dichotomy" Judge Wallace had created. He stated: "I do not want fact finders to believe that to make their findings almost totally unassailable they need only use the right incantation: 'I don't (or I do) believe him because of his demeanor,' or, 'on the basis of testimonial inferences.'" 565 F.2d at 1086.

---

**4.** We also note that the Court in *FCC v. Allentown Broadcasting Corp.*, 349 U.S. 358, 75 S.Ct. 855, 99 L.Ed. 1147 (1955), was concerned with a situation in which the Commission had given little weight to the Examiner's findings as to demeanor. The precise question of the meaning implied by the term "credibility" in *Universal Camera* was not, however, before the Court.

**5.** Judge Duniway concurred as to one portion of the result and dissented as to another part. Judge Choy concurred in all aspects of the actual disposition.

Although we do not think that a distinction between "testimonial inferences" and "derivative inferences" necessarily creates a dichotomy, there is justification for Judge Duniway's fear that Judge Wallace's opinion, read as a whole, could be interpreted as doing so. Judge Wallace stated:

[I]t should be noted that the administrative law judge's opportunity to observe the witnesses' demeanor does not, by itself, require deference with regard to his or her derivative inferences. Observation of demeanor makes weighty only the observer's testimonial inferences. . . . Accordingly, it has been said that a Court of Appeals must abide by the Board's derivative inferences, if drawn from not discredited testimony unless those inferences are "irrational," . . . "tenuous" . . . or "unwarranted." . . . As already noted, however, the Board, as a reviewing body, has little or no basis for disputing an administrative law judge's testimonial inferences.

*Id.* at 1079 (citations omitted). This passage of the opinion can be read as requiring the reviewing court to rubber-stamp an ALJ's findings based on demeanor and permitting the court virtually to disregard the ALJ's findings based on evidentiary facts rather than on demeanor. Such a result would be inconsistent with *Universal Camera* in which the Supreme Court relied on not only the ALJ's opportunity to observe the witnesses but also his having "lived with the case." 340 U.S. at 496, 71 S.Ct. at 468.[6]

We believe that in using the term "credibility" the *Universal Camera* Court intended to distinguish witness demeanor from the credibility determinations inherent in an ALJ's findings. We recognize that the terminology employed by Judge Wallace can be an excellent shorthand for emphasizing that distinction. We also find, however, that "derivative inferences" reached by an ALJ are important to review by a court of appeals. The penultimate

sentence of the *Universal Camera* passage quoted above directs us to consider "[t]he *findings* of the examiner." 340 U.S. at 496, 71 S.Ct. at 468 (emphasis added). The derivative inferences are part of the record before a reviewing court. *NLRB v. Interboro Contractors, Inc.,* 388 F.2d 495, 499 (2d Cir. 1967). As such, they necessarily contribute to the amount of evidence weighed against that supporting the Board in the determination whether the NLRB decision is supported by substantial evidence. To the extent that the ALJ's decision rests explicitly on his evaluation of demeanor, we are required to weigh those particular findings more heavily. If the *Universal Camera* passage is read in its entirety, a narrow interpretation of "credibility" can and should be recognized without creating the dichotomy feared by Judge Duniway.

### B. Application of the Standard

Having carefully reviewed the record below, we find that both the ALJ and the Board were quite explicit as to the considerations compelling their different conclusions. The ALJ carefully noted when he was crediting the testimony of one witness over another in part because of demeanor. For instance, in crediting the testimony of Kopack Jr. regarding Chandler's comment that Kopack Jr. should "keep his mouth shut or . . . Tyrka and Cowles would get rid of him," the ALJ stated both that Chandler's testimony was "lacking in candor" and that Tyrka's hostility to Kopack Jr. was independently established in the record. The ALJ found this behavior violative of section 8(a)(1). In reviewing this finding, the Board stated that the ALJ had relied primarily on demeanor and, citing our previous decision in *Gold Standard Enterprises,* adopted the ALJ's finding of a violation.

Of particular importance to our disposition of this case are the ALJ's findings as to the credibility of the Company's witnesses. Although the ALJ discredited most of Kopack Jr.'s denials relating to his work

---

6. We are by no means convinced that Judge Wallace intended such a dichotomy. He was careful to state, for example, that the ALJ's determinations based on demeanor are not conclusive on the Board. 565 F.2d at 1079.

record, he also found that the testimony of the Company's witnesses showed "signs of exaggeration." Further, the ALJ found that Chandler "equivocated and displayed obvious discomfort" when he testified about Kopack Sr.'s layoff and the semi-tractor incident which allegedly precipitated it. These findings of the ALJ reflect an evaluation of witness demeanor and must, consistent with our view of *Universal Camera,* be given particular weight on review.

 Contrary to the assertions of the petitioners, however, the decision of the ALJ did not turn solely on "credibility," as we construe that term. In addition to the demeanor evidence detailed above, several factors persuaded the ALJ that the Company's justification for Kopack Jr.'s discharge was pretextual. He noted the "history of lenient and favored treatment of Kopack Jr.," the lack of participation by Cowles in the actual discharge, the Company's failure to give Kopack Jr. an explanation for his termination when it occurred, and the timing of Kopack Jr.'s discharge in relation to his father's alleged layoff. Each of these factors is established on the face of the record. The judgment of the ALJ embodies the inferences he drew from the facts. Because these factors do not depend on an assessment of demeanor, however, the Board, in the exercise of its own expertise, can effectively draw its own inferences from the record.

We note that the ALJ also stated that he could not "credit" Chandler's testimony as to the final events leading up to Kopack Jr.'s discharge. Because "credit" is a term the ALJ frequently used in evaluating demeanor, we have paid particular attention to this portion of the ALJ's decision. In this instance, however, his reasons for not finding the evidence persuasive are not demeanor based. He refers to the lack of corroboration of Chandler's final observation of Kopack Jr.'s allegedly reckless driving, and Chandler's failure to specify a reason for the discharge. These factors were equally accessible to the Board from a careful reading of the record.

 These findings of the ALJ, based on the record as a whole, must be considered in determining whether the Board's contrary conclusion is supported by substantial evidence. *Universal Camera v. NLRB,* 340 U.S. 474, 496, 71 S.Ct. 456, 468, 95 L.Ed.2d 456 (1951). They are not however "credibility" determinations, in the sense of demeanor-based findings, that must be given *added* weight in our review of the record.

Turning to the Board's decision, on which we must focus for purposes of review, we do not find that the Board ignored the ALJ's evaluation of witness demeanor. Where the Board differed from the ALJ is in the inferences it drew from the whole of the testimony. Rather than finding that the Company was indifferent to Kopack Jr.'s driving habits, the Board found that the Company's restraint was "more likely explained by Cowles' long and apparently friendly relationship with Kopack Jr., and the fact that he regarded Kopack Jr. as a hard working employee." The Board also found support in the record for its conclusion that the Company viewed the driving infractions more seriously when Inland personnel, who had authority to cancel the Company's contract, complained.

The Board also noted the lack of union animus in the record. Several factors supported this conclusion: Kopack Jr.'s premium pay was continued even after the union business agent spoke against it. Further, Cowles did not express hostility toward Kopack Jr. during their repeated conversations about bus time; rather, he merely stated that the pay would not be restored unless Kopack Jr. obtained something in writing from Inland guaranteeing reimbursement to the Company. The Board further relied on a factor that we find particularly persuasive: Kopack Jr. ceased his protests about overtime pay three weeks before his discharge.

This is not a case which permits no logical inferences other than those reached by the Board. Certainly, Chandler's remarks to Kopack Jr. to "keep his mouth shut," which resulted in the section 8(a)(1) violation upheld by the Board, are some evidence of animus on the part of the Company. Cowles' apparent lack of involvement in the discharge of Kopack Jr. and the Company's

failure to call as witnesses some of the Inland personnel who allegedly had expressed concern about Kopack Jr.'s driving are consistent with the ALJ's finding that the Company's justifications for the discharge were pretextual.

▮ In short, both the inferences drawn by the ALJ and those drawn by the Board have support in the record. Our task on review, however, is limited to judging whether, considering the contradictory evidence in the record, including the ALJ's decision and his reasons therefor, there is substantial evidence in support of the Board's conclusion. *See NLRB v. Pacific Grinding Wheel Co.*, 572 F.2d 1343, 1347 (9th Cir. 1978). Even if we discount somewhat, in response to the ALJ's finding of "exaggeration," the Company's rendition of Kopack Jr.'s driving record, there remains considerable evidence in the record that Kopack Jr. drove dangerously. Inland's increasing dissatisfaction with Kopack Jr.'s driving, and the possibility Inland would cancel the Company's contract as a result, is also established in the record. These facts support the Board's inference that the Company's "sudden concern" over Kopack Jr.'s driving was not a response to his protected activity but to pressure from Inland. This is not therefore a case in which the Board's inferences from not discredited testimony are "tenuous" or "arbitrary." *See Penasquitos Village, Inc. v. NLRB*, 565 F.2d 1074, 1082 (9th Cir. 1977). Nor is it a case in which the Board's findings rested "almost solely on testimonial evidence discredited either expressly or by clear implication by the ALJ." *NLRB v. Gold Standard Enterprises, Inc.*, 607 F.2d 1208, 1212 (7th Cir. 1979) (dictum). We find therefore sufficient evidence in the record to support the Board's conclusion that Kopack Jr.'s discharge was not violative of sections 8(a)(1) and 8(a)(3).

▮ Kopack Sr.'s discharge is illegal only if it was in retaliation for protected activity. Even if we were to accept as conclusive, which we are not required to

do,[7] the ALJ's finding that the semi-tractor incident was not the full and honest explanation of the discharge, the record contains little evidence of union animus apart from the allegedly retaliatory discharge of Kopack Jr. The Board concluded that Kopack Sr.'s discharge was not violative of the Act, stating: "[A]s we have found the evidence insufficient to conclude that Respondent unlawfully retaliated against Kopack Jr. because of his complaints about the overtime, we necessarily reach the same conclusion with respect to Kopack Sr." We find much logic in the Board's reasoning that the legality of Kopack Sr.'s discharge in large measure turns on the legality of Kopack Jr.'s. Although we may be left with no wholly satisfactory explanation of why Kopack Sr. was terminated by the Company, we find sufficient support in the record for the Board's conclusion that it was not retaliatory.

We find therefore substantial evidence in the record to support the Board's conclusion that the discharges of Kopack Jr. and Kopack Sr. were not violative of the Act. The petition for review is therefore

DENIED.

---

7. *E.g., FCC v. Allentown Broadcasting Corp.*, 349 U.S. 358, 364, 75 S.Ct. 855, 859, 99 L.Ed. 1147 (1955); *Penasquitos Village, Inc. v. NLRB*, 565 F.2d 1074, 1079 (9th Cir. 1977); *Ward v. NLRB*, 462 F.2d 8, 12 (5th Cir. 1972).