**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**AUGUSTA BAKERY CORPORATION, Respondent.**

**No. 90–2140.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 1, 1991.

Decided March 24, 1992.

Charles P. Donnelly, Jr., Washington, D.C., Elizabeth Kinney, Chicago, Ill., Aileen A. Armstrong, Frederick Havard (argued), William A. Baudler, N.L.R.B., Appellate Court, Enforcement Litigation, Washington, D.C., for petitioner.

A. Eric Arnold (argued), Zion, Ill., for respondent.

Before CUDAHY and FLAUM, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

FLAUM, Circuit Judge.

The National Labor Relations Board (Board) seeks enforcement of an order against Augusta Bakery Corporation (Augusta). We grant enforcement.

## I.

We briefly set forth the undisputed facts before turning to our review of the Board's determination. Augusta is a family-owned bakery located in Chicago. During the relevant time period, its production employees were represented by Local Union No. 1, Bakery, Confectionary and Tobacco Workers' International Union of America (Union). On November 20, 1985, after efforts to reach a new bargaining agreement proved unsuccessful (the previous agreement had expired on May 31, 1985), the employees initiated an economic strike against Augusta. Using replacement employees, Augusta continued operating during the strike.

On March 17, 1986, Augusta's counsel, Kathy Arnold, sent notice to the Union that Augusta planned to withdraw recognition because a majority of its employees had signed a letter stating that they no longer desired Union representation.[1] On March 24, the Union—through its counsel, Jacob Pomeranz—sent two letters to Augusta: the first identified 12 striking employees and stated that "said employees and the Union are offering unconditionally to immediately return to work"; the second demanded that Augusta "return to negotiations immediately so as to reach agreement on a collective-bargaining contract," and questioned Augusta's good faith doubt regarding the Union's majority status. The letters were sent by overnight courier and delivered together to Arnold at her home on March 25.

Two days later, on March 27, Arnold sent letters to the Union and to each of the dozen bakers. The letter to the Union expressed doubt over whether the offers to return were, indeed, "unconditional," given that the other letter sent on the same date demanded a return to the bargaining table, and outlined Augusta's views of the reinstatement rights of the dozen employees involved. Only one could be immediately reinstated. As to the others, Augusta asserted that two had engaged in strike misconduct; three had abandoned their employment by applying for and/or receiving pension benefits; and six had been permanently replaced. Augusta stated that no positions were available, and that the names of the six who had been replaced would be put on a preferential hiring list. The letters to the individual strikers apprised them of their status with the company.

The Board, upholding the determination of the Administrative Law Judge (ALJ), held that Augusta had violated § 8(a)(1) and (3) of the National Labor Relations Act (Act), 29 U.S.C. § 158(a)(1), (3), by refusing to reinstate 11 of the 12 striking employees subsequent to the March 24 offer to return,

---

1. The Union did not allege that this action constituted an unfair labor practice, and the strike was never converted into an unfair labor practice strike.

which the Board found to be unconditional. The Board's order requires, among other things, that Augusta offer the 11 employees immediate and full reinstatement, with back pay.[2]

## II.

■ We have jurisdiction to consider the Board's petition for enforcement pursuant to 29 U.S.C. § 160(e), which also governs our standard of review. We must uphold the Board's determination if its factual findings are supported by substantial evidence in the record as a whole and its legal conclusions have a reasonable basis in the law. *Id.; Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). Substantial evidence in this context means "such relevant evidence as a reasonable mind might accept as adequate to support" the Board's determination. *Roadmaster Corp. v. NLRB*, 874 F.2d 448, 452 (7th Cir.1989) (quoting *Universal Camera*, 340 U.S. at 477, 71 S.Ct. at 459). This standard of review is well established; it "does not allow us to dabble in factfinding, and we may not displace reasonable determinations simply because we would have come to a different conclusion if we reviewed the case *de novo.*" *NLRB v. P*I*E Nationwide, Inc.*, 923 F.2d 506, 513 (7th Cir.1991); *see also NLRB v. United Ins. Co.*, 390 U.S. 254, 260, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968); *U.S. Marine Corp. v. NLRB*, 944 F.2d 1305, 1314 (7th Cir.1991) (Board's application of the law to particular facts also reviewed under substantial evidence standard), *petition for cert. filed* (Dec. 23, 1991).

The standard "is not modified in any way when the Board and the ALJ disagree as to legal issues or derivative inferences made from the testimony." *Weather Shield Mfg., Inc., Millwork Div. v. NLRB*, 890 F.2d 52, 57 (7th Cir.1989). It is the independent validity of the Board's order that is under review. *Id.* The scope of our review is narrow; we "must uphold the legal conclusions of the Board unless they are irrational or inconsistent with the National Labor Relations Act." *Aqua–Chem, Inc., Cleaver–Brooks Div. v. NLRB*, 910 F.2d 1487, 1490 (7th Cir.1990) (citations omitted), *cert. denied*, —— U.S. ——, 111 S.Ct. 2871, 115 L.Ed.2d 1037 (1991). Additionally, we may not disturb the Board's remedial order "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 216, 85 S.Ct. 398, 405, 13 L.Ed.2d 233 (1964) (quoting *Virginia Elec. & Power Co. v. NLRB*, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943)).

We have expounded upon the standard of review in some detail, for this is a case in which we must keep in mind, as we previously have acknowledged, that "[t]he faithful application of these principles requires a great deal of judicial restraint." *U.S. Marine*, 944 F.2d at 1314.

## III.

■ It is well settled that economic strikers retain their status as employees under the Act, and are entitled to full reinstatement at the conclusion of the strike. 29 U.S.C. § 152(3); *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 378, 88 S.Ct. 543, 545, 19 L.Ed.2d 614 (1967). An employer may not retaliate against striking employees by refusing to reinstate them upon their unconditional offers to return to work; such retaliation would discourage employees from exercising their guaranteed rights to organize and strike. *Fleetwood Trailer*, 389 U.S. at 378, 88 S.Ct. at 546. Accordingly, an employer must reinstate the returning strikers to their former positions unless the employer can show that its action was due to "legitimate and substantial business justifications," in which case it may refuse to reinstate the economic strikers. *Id.* (quoting *NLRB v.*

---

**2.** The order also requires Augusta to cease and desist from the unfair labor practices found, as well as from any similar conduct in restraint of employees' rights under § 7 of the Act, 29 U.S.C. § 157; to expunge from its records and files all references to the misconduct charges and to notify the two involved employees that the references have been expunged; and to post appropriate notices.

*Great Dane Trailers, Inc.*, 388 U.S. 26, 34, 87 S.Ct. 1792, 1798, 18 L.Ed.2d 1027 (1967)).

### A.

■■■■ We first consider whether the offer to return was unconditional. The Board adopted the ALJ's determination that the two letters the Union sent to Arnold on March 24 were unrelated, and that one contained an unconditional offer to return to work. The Board's finding of an unconditional offer is a predominently factual determination, which we must uphold if supported by substantial evidence. Augusta bears the burden of showing that the offer to return was not unconditional. *Soule Glass & Glazing Co. v. NLRB*, 652 F.2d 1055, 1107 (1st Cir.1981); *NLRB v. Okla–Inn*, 488 F.2d 498, 505 (10th Cir. 1973).

In support of its claim that the offer was conditional, Augusta cites *International Union, Allied Industrial Workers v. NLRB*, 411 F.2d 249 (7th Cir.1969), in which we enforced a Board determination that strikers' reinstatement requests were conditioned on the employer's agreement to resume bargaining with the union. *Id.* at 251. In that case, the union had informed the company on July 17 that the strike would be "terminated" on July 20 and, in the same letter, demanded resumption of bargaining—a matter that was subject to a then-pending unfair labor practice charge. On July 20, 61 strikers sent individual but identical letters to the employer which stated, "I make this application for reinstatement with the understanding that [the employer] will continue to recognize and commence bargaining with my duly designated bargaining representative...." We upheld the Board's conclusion that the offer to return was conditional, noting that the company had expressly announced its intent to comply with the determination reached through the administrative processes.[3] *Id.* at 251.

Augusta contends that the Union's two March 24 letters likewise should be construed "as a single, conditional offer," Resp't Br. at 10, the condition being Augusta's return to the bargaining table. Since the offer was not unconditional, the company argues, it did not commit an unfair labor practice in refusing to reinstate the workers.[4] According to Augusta, the simultaneous timing of the letters indicates that the offer was conditional, and a reading which separates the offer from the bargaining request because they were written on separate pieces of paper "is elevating form over substance." Resp't Br. at 13.

■■■■ The Board rests its determination on the opposite assertion: the Union's deci-

---

**3.** The Board ordered the company to bargain on October 13, subsequent to its correspondence with the union but prior to our opinion in the case.

**4.** Augusta maintains that the "chain of conditions" surrounding the letter also supports this reading. It contends that the picketing employees had carried signs the substance of which read "[t]his plant on strike," until approximately March 31—that is, until following the receipt of Augusta's March 27 letter—at which time the signs were altered to read, "Augusta–Heck's Bakeries is unfair to organized labor. They refuse to bargain...." Says Augusta, "The timing here is simply too perfect to be coincidence." The crux of the contention is this: The letters were sent together, at the same time through the same courier. The "offer letter" made an offer to return on behalf of the employees "and the Union." When Augusta asked whether the offer was conditioned upon bargaining, the Union did not clarify the offer, but rather, changed its picket signs—deleting the references to the strike and replacing them with references to bargaining. This, says Augusta, clearly indicates that the Union's prime concern was its own return, not the return of the employees, and that the offer was therefore conditioned on bargaining.

According to Augusta, "had the Union not ceased picketing at or about the time of its alleged offer to return, Augusta would have been that much more justified to discount the Union's alleged offer to return." Resp't Br. at 14. However, the ALJ found that, based on the evidence and credibility determinations, picketing was halted March 24 and resumed only when it was apparent that Augusta did not plan to reinstate the strikers. The Board upheld the ALJ's credibility determinations. Upon review of the record, we find that the Board's determination was based on substantial evidence. We also note that counsel for Augusta conceded at oral argument that the picketing issue is not, ultimately, determinative in resolving whether the offer was conditional.

sion to distinguish, by way of separate letters, the return-to-work offer from the bargaining demand was a way to ensure, "in form and substance," that the issues would remain decoupled. Pet'r Br. at 12. The Board also maintains that this inference is further confirmed by Augusta's failure to mention the bargaining demand issue in its letters to the strikers. Although Augusta expressed its doubt to the Union over whether the offer was unconditional, it failed to do so in its correspondence with the workers, merely offering to place them on a preferential hiring list as required by law when economic strikers make an unconditional offer to return to work.

■ Were we to view the facts as an original matter and with a somewhat cynical eye, we might be sympathetic to Augusta's argument. A creative union might well attempt to circumvent *Allied Industrial Workers* by separating the tangible link between offer and condition by setting them forth in separate letters. However, the facts do suggest two reasonable (albeit diametrically opposed) inferences, and the substantial evidence standard does not allow us to reject the Board's "choice between two fairly conflicting views." *NLRB v. Stor–Rite Metal Prods., Inc.,* 856 F.2d 957, 964 (7th Cir.1988) (quoting *Stokely–Van Camp, Inc. v. NLRB,* 722 F.2d 1324, 1328 (7th Cir.1983)). Where two inferences are possible, we cannot substitute our own inference for that of the Board, so long as the Board's is supported by substantial evidence in the record as a whole. We cannot say that the Board's determination that the offer was unconditional was not so supported.

### B.

Augusta offers three affirmative defenses for its refusal to reinstate the 11 strikers: six, it contends, were permanently replaced; three abandoned their employment by seeking and, in two instances receiving, retirement benefits; and two engaged in misconduct sufficient to warrant refusal to reinstate. The burden of proof on matters which relate to justification for the employ-

er's actions rests with the employer. *Fleetwood Trailer,* 389 U.S. at 378–79 n. 4, 88 S.Ct. at 545–46 n. 4; *Great Dane Trailers,* 388 U.S. at 34, 87 S.Ct. at 1797.

### 1.

■ As noted earlier, an employer may refuse to reinstate economic strikers if it can show a legitimate and substantial business justification for the refusal. One such justification arises when returning strikers' jobs are occupied by permanent replacements hired during the strike to continue operations. *Fleetwood Trailer,* 389 U.S. at 379, 88 S.Ct. at 546; *see NLRB v. Mackay Radio & Telegraph Co.,* 304 U.S. 333, 345–46, 58 S.Ct. 904, 910–11, 82 L.Ed. 1381 (1938). In this way, "labor law purports to recognize business reality and allows a company that has been struck by its work force to hire permanent replacements as business needs dictate." *Aqua–Chem,* 910 F.2d at 1487. The replacements must, however, be permanent. "If an employer hires replacements without a commitment or understanding that the job is permanent and also discharges the strikers, the interest in protecting economic strikers by an entitlement to reinstatement is not overcome by a substantial business justification." *NLRB v. Mars Sales & Equip. Co.,* 626 F.2d 567, 573 (7th Cir.1980); *see Mackay,* 304 U.S. at 345–46, 58 S.Ct. at 910–11.

■ The burden of proving that the replacements were hired as permanent employees lies with the employer. *Fleetwood Trailer,* 389 U.S. at 378, 88 S.Ct. at 546); *see Great Dane Trailers,* 388 U.S. at 34–35, 87 S.Ct. at 1797–1798. To meet its burden, Augusta was required to show it had a "mutual understanding" with the replacements that they were permanent. *Hansen Bros. Enters.,* 279 N.L.R.B. 741, 741 (1986), *enf'd,* 812 F.2d 1443 (D.C.Cir. 1987); *see Associated Grocers,* 253 N.L.R.B. 31, 32 (1980), *enf'd,* 672 F.2d 897 (D.C.Cir.1981). Here, the Board adopted the ALJ's finding that the replacement hires were not permanent because no mutual understanding of permanency existed. This is a question of fact, and we review the Board's determination "only ... to see

if it is supported by substantial evidence." *Mars Sales*, 626 F.2d at 573. "It is the primary responsibility of the Board and not of the courts 'to strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy.'" *Fleetwood Trailer*, 389 U.S. at 378, 88 S.Ct. at 546 (quoting *Great Dane Trailers*, 388 U.S. at 33–34, 87 S.Ct. at 1797–1798).

Augusta contends that it had hired permanent replacements for the strikers, and therefore acted permissibly in placing the names of six workers on a "Laidlaw"[5] preferential hiring list. During the strike, Augusta hired 16 replacement workers who were told that "if they worked out and did their job, they had a job." App. at 18. This statement, Augusta claims, illustrates that the new employees were permanent. However, the testimony of the replacement workers does not indicate that they understood this to be the case. One stated, for example, that no one told him whether or not his job was for a limited time, and further he never asked; another stated that he concluded his job was for an unlimited time, but that none of Augusta's supervisors told him this.[6] Additionally, Augusta stated that when interviewing potential replacements, the company did not make inquiry into future availability for work, and none of the interviewees asked about how long they could work. Although this is admittedly a close call, as the

Board acknowledged at oral argument, the Board could find that the testimony, on balance, does not evince the "mutual understanding" necessary to establish that the replacements were permanent. *See Hansen Bros. Enters.*, 279 N.L.R.B. at 741–42 (no permanent relationship established when employer told replacements that he "wanted" to consider them permanent employees and "wanted" them to consider themselves permanent employees, because he did not actually tell them they were permanent); *Associated Grocers*, 253 N.L.R.B. at 32.[7]

■■ Augusta also urges us to make the inference that replacement employees hired during an economic strike are permanent absent evidence that they were told they were merely temporary. Where two inferences can be drawn, however, it is within the Board's province to determine which is appropriate. Moreover, Augusta's proposed inference runs contrary to the "mutual understanding" requirement already adopted by the Board. *See Hansen Bros. Enters.*, 279 N.L.R.B. at 741 (employer's intent to permanently employ replacements insufficient to satisfy burden of showing mutual understanding). We uphold the Board's determination that Augusta violated the Act by refusing to reinstate these strikers.

2.

■■ Augusta claims that three of the striking workers—all in their sixties—

5. *Laidlaw Corp.*, 171 N.L.R.B. 1366 (1968), *enf'd*, 414 F.2d 99 (7th Cir.1969), *cert. denied*, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100 (1970). *See Aqua-Chem, Inc.*, 910 F.2d at 1489 (emphasis omitted) (observing that Laidlaw preferential hiring strikes a balance between the rights of organized workers and business "by allowing replacement workers to be kept on permanently (*in order to give the replacement workers adequate incentive to take replacement jobs*), but by requiring genuine vacancies in the workforce to be given, in line of seniority, to the striking workers after the strike is over.").

6. In finding that Augusta had failed to establish the permanency of the replacements, the ALJ observed that Augusta called none of the 16 hires to testify. Rather, the parties by stipulation introduced into evidence Joint Exhibit 20, which consisted of excerpts from a separate hearing in which three replacement workers

had testified about the circumstances of their employment with Augusta. It was also stipulated that the ALJ could make credibility findings based on that exhibit.

7. Augusta also contends that the ALJ took out of context the testimony of manager Robert Murdoch, in which he stated that it was not until his March 25 phone conversation with Arnold that they decided "whether they [the strikers] go on a Laidlaw, call them back to work, or what we do." Tr. at 621. Although Augusta's contention that we cannot put much weight on a private conversation between Augusta and its attorney regarding what course of action to follow has some merit, the Board did not rest its decision on this conversation. Given the ambiguity of the overall testimony of both Murdoch and the replacement workers, we cannot say that the Board's determination had insufficient basis in the record.

had abandoned their employment by applying for and, in two instances, receiving, their pension benefits during the strike.[8] An employer is not required to offer reinstatement to strikers who have abandoned their employment. To establish abandonment—and therefore rebut the assumption of post-strike reinstatement—an employer must present "unequivocal evidence" of the striker's intent to "permanently sever" the employment relationship. *Harrowe Servo Controls*, 250 N.L.R.B. 958, 964 (1980) (quoting *S & M Mfg. Co.*, 165 N.L.R.B. 663, 663 (1967)).

■ The ALJ determined that Augusta's actions pertaining to the "retirees" were discriminatorily motivated based on an established pattern of retaliation, and concluded that Augusta had therefore violated the Act in denying reinstatement to the three workers who had submitted their pension papers during the strike. The ALJ found that each needed the money to pay bills during the strike period and had not evinced an intent to sever the employment relationship. Moreover, they had continued to participate in the strike, serving as pickets, and their names were included among the 12 employees listed in the unconditional offer letter. Although the Board discounted the ALJ's determination that Augusta's actions were discriminatorily motivated, it adopted the ALJ's conclusion that the strikers had not abandoned their employment, albeit on a different basis—that Augusta had not presented unequivocal evidence of the strikers' intent to permanently sever the employment relationship. Thus, the Board concluded, Augusta had not established a legitimate business reason for denying reinstatement to the three "retired" employees. Augusta maintains the Board's decision is "curious," Resp't Br. at 25, given that the ALJ had stated that it would be "relatively easy to conclude that their cases should be dismissed" absent the pattern of retaliation—which is precisely the basis rejected by the Board in upholding the ALJ's ultimate conclusion.

■ As a general matter, where the Board does not accept the ALJ's findings we do not abandon the substantial evidence standard, but "the evidence supporting the Board's conclusion may be viewed as less substantial than it would be if the Board and the ALJ had reached the same conclusion." *Lapham–Hickey Steel Corp. v. NLRB*, 904 F.2d 1180, 1186 (7th Cir.1990) (quoting *NLRB v. Stor–Rite Metal Prods.*, 856 F.2d 957, 964 (7th Cir.1988)). However, the significance of the ALJ's findings depends largely upon the role credibility determinations played in the outcome of the case. *Universal Camera*, 340 U.S. at 496, 71 S.Ct. at 468. " 'Credibility,' in this context, refers primarily to 'testimonial inferences'—those that rest on direct observations of the demeanor of witnesses—rather than 'derivative inferences'—those that are drawn from the substance of the evidence." *Stor–Rite Metal*, 856 F.2d at 965 (citing *Kopack v. NLRB*, 668 F.2d 946, 953 (7th Cir.), *cert. denied*, 456 U.S. 994, 102 S.Ct. 2278, 73 L.Ed.2d 1290 (1982)). As we previously mentioned, our standard is not modified when the Board's disagreement with the ALJ is grounded upon derivative inferences. *See Weather Shield Mfg.*, 890 F.2d at 57. That is the situation here. The ALJ found a "clear inference that [Augusta's] conduct toward the three 'retirees' was based upon an unlawful motive." App. at 16. Although this determination "embodies the inferences [the ALJ] drew from the facts," *Kopack*, 668 F.2d at 955, the ALJ's decision did not turn solely on credibility as we have construed the term. The ALJ did "not depend on an assessment of demeanor," *id.*, and therefore, "the Board, in the exercise of its own expertise, can effectively draw its own in-

---

**8.** Two had begun receiving pension benefits from the Union's pension fund prior to the March 24, 1986, "offer" letter, and the third was to begin receiving benefits April 1. Augusta notified the third that he would be retired as of April 1 or, if he elected not to receive the benefits, would be placed on the preferential hiring list. According to Augusta, it therefore had an additional lawful reason—*i.e.*, permanent replacement—not to offer him reinstatement. The Board rejected (as do we) this contention, adopting the ALJ's finding that the replacements were not permanent hires.

ferences from the record." *Id.* Our task, then, is limited to determining whether substantial evidence supports the Board's conclusion. *Id.* at 956.

Augusta relies heavily on *Giddings v. Lewis*, 240 N.L.R.B. 441 (1979), in which the Board held that the employer did not have to reinstate employees who had received pension benefits during the strike. Although similar to the instant case, *Giddings* also contains relevant differences.[9] Of primary importance, the ALJ in *Giddings* found the testimony of the employer's representatives more credible than that of the strikers. Here, the ALJ credited the strikers' testimony over that of the company. Moreover, in *Giddings*, although the employer notified the union of the strikers' retirement and their removal from the seniority list, a three- to eight-month period elapsed before the retirees asserted their right to reinstatement. Here, the strikers' names were included in the Union's March 24 offer letter—a strong indication of intent not to retire.

For its part, the Board relies on *Rose Printing*, 289 N.L.R.B. 252 (1988), hinging much of its argument on the notion of "direct communication." The Board in *Rose Printing* held that "to preclude a finding that a striker has permanently severed his employment by a *direct communication* to the employer of his intention to quit there must be a showing of some reservation or qualification in the quitting or a showing of continued interest by the striker." *Id.* at 276 (emphasis added); *see also P.B.R. Co.*, 216 N.L.R.B. 602 (1975) (in finding abandonment, Board noted that strikers initiated conversations with employer by stating that they wanted to terminate employment). According to the Board, the employees in *Giddings* had directly communicated with their employer and knew that retirement might pose a risk

for future re-employment, whereas in the instant case, no such direct communication occurred—the employees applied for their benefits through the benefit department, and did not speak directly with Augusta management about their retirement status. Thus, here there were no direct communications between the strikers and the company from which the "retirees" could glean that future employment would be doomed as a consequence of drawing pension benefits.

Although this argument pins much on a technical distinction, we find *Rose* persuasive, for other reasons. In *Rose*, as here, termination of employment was the only way the striking employees could obtain their retirement contributions. As here, all of the strikers indicated that this was their purpose in resigning and, as here, there was no showing that they had obtained employment elsewhere at the time of their resignations. And, just as the strikers in *Rose* continued to participate in the strike following their resignations, here too, there was no evidence that they abandoned the strike following their resignations. Moreover, Augusta's manager "was aware that the three pension applicants continued to picket." Tr. at 434. In *Rose*, the employees had expressed no reservations upon resigning, but the Board determined that, given the "circumstances and existing economic need cited by the strikers," the resignations did not evince their intent to permanently abandon their jobs. Finally, to the extent that *Rose* and *Giddings* may differ, *Rose* is the more recent exposition of the issue. We uphold the Board's determination that the three strikers who applied for pension benefits did not abandon their employment.

### 3. Misconduct

▇▇▇▇▇ Augusta dismissed two of the strikers following the March 24 offer letter

---

9. We disagree with the Board's contention that the fact that the plan's failure to preclude employees from returning to work indicated to Augusta that the retirement might be temporary. The *Giddings* plan, too, provided for the possibility of re-employment, but the Board found this factor unpersuasive.

We also disagree with Augusta's claim that the fact that the "retirees" would suffer penalties

under the plan if they returned to regular employment (pension payments are temporarily suspended upon the pensioner's return to work) indicates an intent to sever. Faced with economic realities, surely some employees would be willing to suffer some loss in the long run in return for financial survival in the short run.

on the ground that they had participated in strike misconduct warranting termination. The Act does not protect striking employees who commit acts of vandalism or sabotage against their employer. *See Clear Pine Mouldings, Inc.,* 268 N.L.R.B. 1044, 1045 (1984), *enf'd,* 765 F.2d 148 (9th Cir. 1985), *cert. denied,* 474 U.S. 1105, 106 S.Ct. 893, 88 L.Ed.2d 926 (1986). To lawfully deny an employee reinstatement at the conclusion of a strike on this ground, an employer must produce evidence connecting the discharged employees to specific strike misconduct. *See General Telephone Co.,* 251 N.L.R.B. 737, 739 (1980), *enf'd,* 672 F.2d 894 (D.C.Cir.1981). Such conduct "must have had a tendency to coerce other employees in the exercise of their protected rights." *Richmond Recording Corp. v. NLRB,* 836 F.2d 289, 295 (7th Cir.1987). Additionally, "[t]he honest belief of an employer that striking employees have engaged in misconduct provides an adequate defense to a charge of discrimination in refusing to reinstate such employees, unless it affirmatively appears that such misconduct did not in fact occur." *Rubin Bros. Footwear, Inc.,* 99 N.L.R.B. 610, 611 (1952). The discharge is therefore unlawful if the evidence supports a finding that no misconduct occurred, notwithstanding the employer's good faith belief that it did occur.

The ALJ's primary determinations were threefold: he found that Augusta did not have an honest belief that the two strikers had engaged in strike misconduct sufficient to justify the discharge; crediting the two strikers' denials that they had engaged in the misconduct, he found that they did not commit the acts for which they were accused; and he determined that, even had the misconduct occurred, it was de minimis in nature and insufficient to warrant termination. Based upon these findings, the ALJ concluded that Augusta's discharge of the strikers on misconduct grounds had violated the Act. In upholding this conclusion, the Board stated that it did not rely on the ALJ's findings that Augusta did not have an honest belief regarding the misconduct. Nor did it rely on the ALJ's finding that any misconduct that occurred was de

minimis. Rather, assuming *arguendo* that Augusta acted in good faith, the Board upheld the ALJ's credibility determinations and found that the strikers had not engaged in the misconduct.

As to one of the two strikers involved, Tadeusz Dlugolecki, we have relatively little difficulty in upholding the Board's conclusion. The Board credited Dlugolecki's denial that he had damaged windows at the company's facility during the strike. As the Board acknowledged, the testimony of Augusta's witnesses—a supervisor, who stated that he saw the broken windows and Dlugolecki nearby, and a nonstriking employee, who stated he saw Dlugolecki standing near the broken windows but that he did not see who broke the window—does not preclude a finding by the ALJ of no strike misconduct. The ALJ credited Dlugolecki's testimony over Augusta's witnesses. We again emphasize that "credibility determinations are to be made by the ALJ and the Board and will not be overturned by a reviewing court absent extraordinary circumstances." *NLRB v. Illinois–American Water Co., S. Div.,* 933 F.2d 1368, 1374 (7th Cir.1991) (quoting *NLRB v. Berger Transfer & Storage Co.,* 678 F.2d 679, 687 (7th Cir.1982)); *see also NLRB v. Rich's Precision Foundry, Inc.,* 667 F.2d 613, 622 (7th Cir.1981). " 'Extraordinary circumstances' include bias by the ALJ or the ALJ's disregard for sworn testimony." *Berger,* 678 F.2d at 679. Such circumstances do not exist here. Just because the ALJ credited the testimony of the striker over that of the witnesses for Augusta does not provide a grounds for reversal. *See NLRB v. Del Rey Tortilleria, Inc.,* 787 F.2d 1118, 1121 (7th Cir.1986). An ALJ's credibility resolutions are entitled to deference when a choice must be made between competing versions of the same incident. *Richmond Recording,* 836 F.2d at 295. Sufficient evidence exists on the record to determine that Dlugolecki did not engage in strike misconduct.

A more difficult task faces us with regard to Miroslaw Browarski, the other striker discharged for misconduct. Augusta attempted to introduce into evidence the

affidavit of nonstriking employee Frank Acevedo, whose statement was taken by a Board agent in January 1986, which indicated that Acevedo saw Browarski throw a board at one of Augusta's windows. The ALJ ruled that Acevedo's testimony, whether in person or through the affidavit, was inappropriate surrebuttal and should have been presented during Augusta's case in chief regarding its good faith belief of strike misconduct.[10] The Board affirmed the ALJ's refusal to admit the affidavit, but solely on the basis that it did not fall within the unavailable declarant exception to the hearsay rule, *see* Fed.R.Evid. 804(a)(5), because Augusta had not shown that it was unable to procure Acevedo's presence at the hearing by process or other reasonable means.

█ The Board raises two primary arguments to support its determination—one threshold, the other substantive. First, the Board asserts that Augusta is barred from seeking review here because it failed, under § 10(e) of the Act, to request reconsideration before the Board. *See* Pet'r Br. at 27. Section 10(e) provides that, absent extraordinary circumstances, we may not consider objections that were not presented to the ALJ or Board.[11] The provision serves two purposes. First, it has a notice function that ensures that the Board has the first opportunity to resolve all issues properly before it. *NLRB v. Wayne Transp., Div. of Wayne Corp.,* 776 F.2d 745, 749 (7th Cir.1985). Second, "it ensures against repetitive appeals to the courts." *Id.; see also U.S. Marine Corp.,* 944 F.2d at 1319 n. 17. The Board has implemented this statutory policy by adopting regulations providing that "[a]ny exception to a ruling, finding, conclusion, or recommendation which is not specifically urged shall be

deemed to have been waived," 29 C.F.R. 102.46(b), and that "[n]o matter not included in exceptions or cross-exceptions may thereafter be urged before the Board, or in any further proceeding." *Id.* § 102.46(h). In interpreting § 10(e), the notice function is paramount: we determine "whether a party's exceptions are sufficiently specific to apprise the Board that an issue might be pursued on appeal." *Consolidated Freightways v. NLRB,* 669 F.2d 790, 793 (D.C.Cir.1981). "In short, the statute requires notice of objection." *Local 900, Int'l Union of Elec., Radio and Machine Workers, AFL–CIO v. NLRB,* 727 F.2d 1184, 1192 (D.C.Cir.1984).

█ Here, Augusta filed numerous exceptions to the ALJ's recommendations. One of those specifically objected to the exclusion of the affidavit: "The [ALJ] erred in rejecting Respondent's offer of proof proffering the testimony of Frank Acevedo as direct evidence of strike misconduct by striker Mirolsaw Browarski." Resp't Employer's Exceptions to the Administrative Law Judge's Decision and Recommended Order at 1. The Board argues that Augusta nevertheless was obliged to seek reconsideration of the Board's decision. We disagree. Augusta's exception to the ALJ's decision to exclude the affidavit and accompanying brief were adequate to apprise the Board that Augusta intended to press the issue now on appeal. Although Augusta did not object specifically to the Board's evidentiary determination through a motion for reconsideration, our inquiry "must be guided by the purposes of section 10(e)." *Local 900,* 727 F.2d at 1192. Here, Augusta's argument was considerably more focused than the general *pro forma* objections found to be impermissibly vague in other cases finding a § 10(e) bar,

10. As mentioned previously, the employer's honest belief that striking employees have engaged in misconduct provides an adequate defense to a charge of discrimination in refusing to reinstate the strikers, "unless it affirmatively appears that such misconduct did not in fact occur." *Rubin Bros. Footwear,* 99 N.L.R.B. at 611. Once the employer establishes the good faith belief, "the General Counsel must go forward with evidence to prove that the employees did not, in fact, engage in such misconduct." *Id.*

The employer may then rebut with evidence that the unlawful conduct did occur. *Id.*

11. Section 10(e) provides in pertinent part:
No objection that has not been urged before the Board ... shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.
29 U.S.C. § 160(e).

*see NLRB v. Blake Constr. Co.*, 663 F.2d 272, 284 (D.C.Cir.1981), and its objection to the exclusion of the affidavit was specific enough to alert the Board that its exclusion on any grounds would be an issue on appeal.

On to the substantive issue. Section 10(b) of the Act provides that the Board shall, "so far as practicable," conduct unfair labor practice hearings in accordance with the Federal Rules of Evidence. 29 U.S.C. § 160(b). The Board is not bound absolutely to apply the Federal Rules of Evidence under this provision, *NLRB v. Maywood Do–Nut Co.*, 659 F.2d 108, 110 (9th Cir.1981), and it may, where appropriate, fashion its own particular rule of evidence—for example, where a rule will facilitate the bargaining process. *See id.* (within Board's discretion under § 10(b) to establish rule excluding surreptitiously prepared tape recordings of negotiations in light of chilling effect such evidence would have on bargaining process) (citing *Carpenter Sprinkler Corp. v. NLRB*, 605 F.2d 60, 66 (2d Cir.1979)). However, this does not necessarily "justify the exclusion of evidence ... which it would be error to exclude ... in a federal district court." *Maywood Do–Nut*, 659 F.2d at 110 (quoting *General Eng'g, Inc. v. NLRB*, 341 F.2d 367, 374 (9th Cir.1965)). Here, the Board cites to Fed.R.Evid. 804(a)(5), and explicitly acknowledges that it "relied solely on the rules governing hearsay" in excluding the affidavit. Pet'r Br. at 26. The "as far as practicable" provision is therefore inapplicable here, and we must determine whether the Board correctly applied the federal evidentiary rules in excluding Acevedo's affidavit based on Augusta's failure to show unavailability. *See NLRB v. Bakers of Paris, Inc.*, 929 F.2d 1427, 1434 (9th Cir. 1991) (court ordinarily determines whether the Board properly applied Federal Rules of Evidence).

The Board and Augusta agree that the affidavit was hearsay. The Board determined that the affidavit was inadmissi-ble under the unavailable declarant exception to the hearsay rule because Augusta had not shown that it was unable to procure Acevedo's presence at the hearing by process or other reasonable means.[12] Augusta had the burden of demonstrating that Acevedo was unavailable. *See Moore v. Mississippi Valley State Univ.*, 871 F.2d 545, 552 (5th Cir.1989).

Augusta does not dispute that it did not demonstrate Acevedo's unavailability; rather, it maintains that the ALJ prevented it from doing so. According to Augusta, when the ALJ rejected the affidavit on the ground that it should have been offered in Augusta's case-in-chief, the ALJ refused to allow Augusta to include in the offer of proof the necessary information to establish Acevedo's unavailability. Augusta argues that "[t]he Board transmutes the ALJ's refusal to accept unavailability information into a failure by Augusta to make a showing that it was unable to procure his attendance...." Reply Br. at 17.

The Board contends, however, that Augusta had an opportunity to satisfy the rule, "at the point when the [ALJ] allowed an offer of proof as to what the affidavit said." Pet'r Br. at 27. We agree. Augusta admits that it intended to include in the offer of proof its showing of Acevedo's unavailability. *See* Resp't Br. at 32 ("Counsel for Augusta attempted make [sic] an offer of proof setting out ... the unavailability of the Mr. Acevedo [sic] when ALJ Denison interrupted and refused any offer of proof other than an oral statement about what the witness say [sic] if allowed to testify."). A review of the transcript from that offer of proof indicates that the ALJ did not, as Augusta asserts, preclude it from making that showing; the ALJ's interruption did not occur until after Augusta's counsel had fully addressed the unavailability issue:

> Arnold: The offer of proof, your honor, is this, that the witness, Mr. Frank Acevedo, is unavailable and that his attend-

---

12. Fed.R.Evid. 804(a)(5) defines a witness as "unavailable" where the declarant "is absent from the hearing and the proponent of a state-ment has been unable to procure the declarant's attendance ... by process or other reasonable means."

ance to testify cannot be procured by process or other reasonable means as a result we offer to present in as Respondent's Exhibit Number 12, the affidavit of Mr. Frank Acevedo which affidavit is signed and sworn to before an Agent of the [Board], dated January 24, 1986 and if this Exhibit is accepted and placed in the record, it will reflect Mr. Acevedo's testimony....

Judge Denison: Now this is not a proper offer of proof. I am sorry. It—you are one step removed. An offer of proof is that if a witness were permitted to testify, a witness would testify "xyz."

Tr. at 853. Augusta's conclusory offer of proof offered nothing except the plain assertion that Acevedo was unavailable. *See Moore*, 871 F.2d at 552. Augusta failed to explain why Acevedo was unavailable, or to show that it had attempted to procure Acevedo's presence. Accordingly, we uphold the Board's ruling that the affidavit was inadmissible pursuant to Fed.R.Evid. 804(a)(5).

In the absence of the Acevedo affidavit, we find that substantial evidence existed upon which the Board could determine that Browarski did not engage in strike misconduct sufficient to warrant discharge. We uphold the Board's determination that Augusta was in violation of the Act by discharging Dlugolecki and Browarski on strike misconduct grounds.

＊　＊　＊　＊　＊　＊

For the foregoing reasons, we grant enforcement of the Board's order.