STATE OF MAINE                          SUPERIOR COURT
CUMBERLAND, ss                          CIVIL ACTION
                                        DOCKET NO. CV-14-263


DONALD LANDRY,

              Plaintiff

v.                                      JUDGMENT

WILLIAM BACON,

              Defendant

STATE OF MAINE
Cumberland, ss, Clerk's Office
JAN 29 2018
11:13 AM
RECEIVED

On November 6-7, 2017, jury-waived trial was held on plaintiff's complaint, in which plaintiff alleges defendant committed fraud and conversion. Both parties appeared and were represented by counsel. For the following reason, judgment is entered in favor of defendant

FACTS

Plaintiff is 53 years old and lives in Falmouth. His employment has centered on computer information systems. He has been employed at UNUM, Wright Express, Dartmouth Hitchcock Medical Center and, currently, at Berry Dunn. Plaintiff is twice divorced. His second wife was Tanya Bacon, defendant's sister. During that marriage, which took place in 2006, plaintiff got to know defendant and became familiar with his voice.

Plaintiff did not perform any credit or background checks on Ms. Bacon prior to the marriage. He did not inquire about the financial details of her prior divorce. She was employed at a school, rented her home, owned her car, and had $30,000.00 in the bank. He had no reason not to trust her. The two discussed finances and she wanted to manage their finances. Ms. Bacon stated she had bookkeeping experience. Plaintiff was the principal income earner but

1

agreed to Ms. Bacon's proposal because it would be one fewer thing he had to do. Ms. Bacon monitored the bank accounts, paid the bills, handled the taxes, and took care of the mail.

Plaintiff and Ms. Bacon lived in Windham. Ms. Bacon began working for her parents in their hearing aid business and earned approximately $40,000.00 annually. Plaintiff worked for Wright Express from 2004 until 2009 and earned $95,000.00 annually. They shared bank accounts at TD Bank North and USAA. When statements from these institutions arrived in the mail, plaintiff left them on the kitchen table for Ms. Bacon.

Plaintiff opened a 401K retirement plan with Fidelity Investments in early 1987 while employed at UNUM. He made no further contributions to the plan after he left that employment in 2004 and did not contribute during the marriage. Plaintiff did not give Ms. Bacon his user identification or password for the Fidelity account. On March 14, 2007, plaintiff rolled over the 401K plan to an IRA and withdrew $100,000.00 to pay off the home equity line of credit. (Pl.'s Ex. 2.) He made no further withdrawals. Plaintiff called Fidelity and accessed his account on October 18, 2007 but did not remember the reason for doing so and did not look at the details of the account at that time. (Pl.'s Exs. 6, 8, 27.)

The Fidelity account was accessible on line. Plaintiff specified he wanted to receive statements electronically. (Pl.'s Ex. 26, 1757.) There was no beneficiary designation for the Fidelity account. (Pl.'s Ex. 26, 1757.) Dividends were reinvested.

From 2007 to 2010, plaintiff had many things to deal with, including five children. He was working around the clock at Wright Express. In 2008, Ms. Bacon told plaintiff she had a pituitary tumor that required chemotherapy. Plaintiff did not believe her because she "lied profusely" but he was not allowed to meet with her doctors. Also in 2007-2008, he faced a custody dispute with his first wife with regard to his three daughters. He was required to

2

disclose to the court all of his assets. He assumed that Ms. Bacon prepared the disclosure document and he signed it. His children began living with their mother after the dispute. Until June 2018, plaintiff is ordered to pay to his first wife child support of $900.00 per month. He never checked his account balance and did not pay attention to the account.

The Fidelity account was to be used for his retirement, twenty years in the future, and then left to his daughters in his will. Even during the 2008 stock market crash, plaintiff did not review his investments in the Fidelity account, even though his friends complained they had lost substantial amounts of money from their investment accounts.

Plaintiff and Ms. Bacon moved to New Hampshire so she could be closer to her grandmother, who was ill. Plaintiff began employment at Dartmouth Hitchcock. He made a round trip to Maine every other weekend to see his daughters. One of Ms. Bacon's sons was diagnosed with Aspberger's and had difficulty in school. In 2010, Ms. Bacon was "supposedly" diagnosed with bi-polar disorder and engaged in bizarre behavior toward plaintiff. He wanted to leave her and suffered from depression. They attended marriage counseling briefly. Plaintiff saw a counselor with his daughters. Plaintiff and Ms. Bacon separated in late 2012.

Plaintiff saw his counselor, Faith Caplan, frequently. At her suggestion, plaintiff set up his own bank accounts and arranged his own budget. In September 2012, he called Fidelity about his retirement account but was unable to access the account. He was told to go to a branch of Fidelity because he had no information about the account. He went to the Portland branch. He called Fidelity again in late September 2012, explained the situation and asked for, at least, the balance, which was $215.00. (Pl.'s Ex. 16.) Plaintiff responded that there was more than $200,000.00 in the account.

After learning about the Fidelity account balance, plaintiff changed his address to his employment address for mail from Fidelity and made other requests. (Pl.'s Exs. 17, 19-20.) Plaintiff was unaware that Ms. Bacon had changed the email address on the Fidelity account from plaintiff to Ms. Bacon or that the pin had been changed. (Pl.'s Exs. 3-4.) Plaintiff learned about these events when he received documents from Fidelity after he learned the Fidelity account had been drained. He also learned that on November 5, 2007, Ms. Bacon called Fidelity but was unable to access the account and was told her husband had to call Fidelity. (Pl.'s Ex. 28.) On November 7, 2007, a male called Fidelity and identified himself as plaintiff and reestablished the pin for the account. Plaintiff identified the voice on the recording of the call as defendant's voice. (Pl.'s Ex. 29.) Defendant denied making the call. During their depositions, Lee Julich, defendant's aunt, and Aaron Green, Ms. Bacon's first husband, also identified the voice on the recording as defendant's voice. (Julich Dep. 21, 23-24, 35-36; Green Dep. 16, 19-20.) Plaintiff first heard these recordings in March 2013.

As a result of the calls to Fidelity on March 5 and 7, 2007, the pin for the Fidelity account was reestablished and the email address was updated to Ms. Bacon's address. (Pl.'s Exs. 12-13.) On January 25, 2008, Ms. Bacon was named as beneficiary for the account. (Pl.'s Ex. 14.) Plaintiff did not know about any of these changes until he began his investigation after he learned the account balance in 2012. After the November 7, 2007 call until August 13, 2008, $193,700.00 was removed from the Fidelity account. (Pl.'s Ex. 21; Sikowitz Dep. 30.) At the time plaintiff accessed his Fidelity account on October 18, 2007, $83,250.00 had been withdrawn from the account. (Pl.'s Ex. 21.)

If the funds had remained in the account, the value of the account would have been $304,398.00 as of January 17, 2014. (Sikowitz Dep. 36.) The actual value of the account on that

date was $277.26. (Sikowitz Dep. 37.) The total lost opportunity to plaintiff's Fidelity account was $304,121.00. as of January 17, 2017 and $305,255.00 as of April 25, 2017. (Sikowitz Dep. 40, 57.)

The funds were transferred to TD Bank North or USAA. (Def.'s Ex. 4.) The TD Bank North account # 9952 was solely in plaintiff's name. (Def.'s Ex. 4.) The USAA account was in the names of plaintiff and Ms. Bacon. (Defs.'s Ex. 5.) Although plaintiff challenged at trial the payments made from these accounts, household bills clearly were paid from the accounts. Two checks were written to defendant in 2007 from the USAA and TD Bank North accounts. One check was for a birthday present for defendant's son and one was for a medical procedure for defendant's wife. He received no other funds from the Fidelity account.

Plaintiff expected the expenses for his family of seven to be paid from the approximately $5,000.00 deposited each month from his employment. He did not recall ever discussing household expenses with Ms. Bacon. She ran the finances and "that's the way it was."

Plaintiff did not review the Fidelity records of withdrawals from the account or the records from the TD Bank North or USAA accounts until 2012, when he learned the balance of the Fidelity account and began his investigation. He agreed the records were sent to his address and he had the opportunity to review the records, including records of overdraft fees assessed. Plaintiff also did not receive emails from Fidelity about his account, although he agreed notices were to be sent monthly to his email address. The email address given was his UNUM address and he had left that job and not changed the address. He did not recall seeing tax statements from Fidelity for 2007 and onward. He did not review W2s or tax returns before they were submitted. Plaintiff did not review any ATM receipts, which show the amount of the withdrawal and the balance in the account. Plaintiff was unaware until 2012 that there were ongoing disputes with

5

the Internal Revenue Service during 2007-2008 and 2010 through 2013. Plaintiff did not change his password for the Fidelity account until 2012.

In 2013, plaintiff sued Fidelity in a Financial Industries Regulatory Authority dispute. (Def.'s Ex. 9.) Plaintiff alleged that there was no reason "why Fidelity should have allowed anyone other than Mr. Landry to access the Account, make trades, change account information, or make withdrawals." Plaintiff stated he "was not managing or monitoring the Account." Plaintiff further alleged:

> Fidelity had inadequate compliance policies and procedures to prevent unauthorized account activity, failed to follow its compliances policies and procedures, or both. Either there was no account supervision or if there was supervision it was inadequate. Fidelity's failure to stop unauthorized withdrawals from the account and to notify Mr. Landry in a timely manner is inexcusable. The duty of the broker-dealers to obtain customer authorization before making trades is among the most basic duties of a broker-dealer. Similarly, the duty to prevent unauthorized access by a third party to trade a customer's funds, much less misappropriate those funds, is among those basic duties as well.

(Def.'s Ex. 9; see Def.'s Exs. 10, 12.) Plaintiff sought actual damages of $272,450.00, punitive damages, interest, attorney's fees, and costs. (Def.'s Ex. 9.) Plaintiff received a gross arbitration award of $125,140.78 plus interest at the New Hampshire statutory rate. (Pl.'s Exs. 33-34.) The other relief requested was specifically denied. (Pl.'s Ex. 33.) After attorney's fees were paid, plaintiff received $78,000.00. (Pl.'s Ex. 35.) Plaintiff agreed at trial that Fidelity did not follow appropriate procedures in allowing access and changes to plaintiff's account and its actions were not justifiable.

When plaintiff and Ms. Bacon divorced, the divorce decree provided that she would pay $65,000.00 to plaintiff over twelve years. (Pl.'s Ex. 36.) She has made no payments. Plaintiff intends to proceed in court against Ms. Bacon with an attorney in New Hampshire.

6

Ms. Bacon was not present to testify at trial. Plaintiff and his attorneys attempted to locate her through search engines and background checks to determine her physical location. New Hampshire attorneys attempted unsuccessfully to serve her at her residence in Concord, New Hampshire. Phone calls were made to her but she did not respond. The New Hampshire attorneys sent an email on the first day of trial and indicated she worked for Phillips Academy in Massachusetts.

Raymond Williams is a patrol sergeant with the Windham Police Department. In February 2013, he received a complaint from plaintiff regarding the Fidelity account. On August 15, 2013, he met with Ms. Bacon, along with Detective Hanover. Sergeant Williams recorded the conversation about plaintiff's Fidelity account. It was his regular practice to record interviews during an investigation. He kept the recording in a folder on his computer in the course of his regularly conducted investigative duties as a law enforcement officer.

During the interview, Ms. Bacon admitted that she asked defendant to call Fidelity because she could not access the funds. She did not know why she did not ask plaintiff to access the account. She withdrew the Fidelity account funds and used them to supplement plaintiff's income and to pay household expenses. She said the custody dispute with plaintiff's first wife was becoming expensive with two attorneys and a guardian ad litem. She stated she had not spoken to defendant in three years because they do not get along but that he did not benefit from the Fidelity funds. Sergeant Williams was given the audio tape from Fidelity of the call purportedly from plaintiff requesting to reestablish his pin number and played that for Ms. Bacon. She identified the voice as her brother's voice. Nothing about the recording of the interview with Ms. Bacon indicates a lack of trustworthiness.

## CONCLUSIONS

### 1. Sergeant Williams's Testimony about Toyna Bacon's Statements

Under the Rules of Evidence, a witness is unavailable when she "is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance . . . by process or other reasonable means." Fed. R. Evid. 804(a)(5). Maine Rule of Evidence 804(a)(5) "requires that the proponent of [an out of court] statement make a showing of reasonable effort or good faith attempt to procure the attendance of the witness before that witness may be declared unavailable . . . ." State v. Preston, 521 A.2d 305, 307 (Me. 1987) (holding that there was no evidence in the record on which a justice, presiding over a hearing on a motion for a new trial, could base a finding of witness unavailability); see also NLRB v. Augusta Bakery Corp., 957 F.2d 1467, 1480 (7th. Cir. 1992) (witness's affidavit was inadmissible pursuant to Fed. R. Evid. 804(a)(5) because defendant's conclusory offer of proof provided nothing except the plain assertion that the witness was unavailable; defendant failed to explain why the witness was unavailable, or to show that defendant had attempted to procure the witness's presence). The burden is on the offering party to supply such justification. See Moore v. Mississippi Valley State University, 871 F.2d 545, 552 (5th Cir. 1989) (plaintiff offered nothing except the plain assertion that a witness was unavailable, made no effort to explain the unavailability, offered no explanation to the trial court, and thus failed to meet her burden; trial court did not err in excluding the witness's testimony by deposition).

On this record, Ms. Bacon was unavailable for trial. Sergeant Williams was qualified to establish that the tape of his interview with Ms. Bacon was a record of a regularly conducted activity by the Windham Police Department. M.R. Evid. 803(6). Additionally, Ms. Bacon's statements were against her interest. M.R. Evid. 804(b)(3)(A).

8

The court took de bene esse the testimony of Sergeant Williams about Ms. Bacon's statements. That testimony is admissible.

2. Assessment of Credibility

Both plaintiff and defendant described Ms. Bacon's character very negatively, using words such as "unstable," "incredibly dishonest," and "snake" and noted that she "lied profusely." Plaintiff did not believe the medical diagnoses Ms. Bacon told him she had been given. Plaintiff now, however, asks the court to accord significant weight to her out of court statements; the court declines to do so. Further, although plaintiff succeeded in offering into evidence the deposition testimony of Lee Julich and Aaron Green, judging credibility from the written page is difficult. Finally, the hostility plaintiff demonstrated toward defendant at trial, which resulted on one occasion in the court's admonishment of plaintiff, did not enhance his credibility with the court.

3. Statute of Limitations

In general, all civil actions "shall be commenced within 6 years after the cause of action accrues and not afterwards." 14 M.R.S. § 752 (2017). "If a person, liable to an action mentioned, fraudulently conceal the cause of action from the person entitled thereto, or if a fraud is committed which entitles any person to an action, the action may be commenced at any time within 6 years after the person entitled thereto discovers that he has just cause of action." 14 M.R.S. § 859 (2017). Pursuant to section 859, the statute of limitations begins to run "when the existence of the cause of action or fraud is discovered or should have been discovered by the plaintiff in the exercise of due diligence and ordinary prudence." Kobritz v. Severance, 2007 ME 3, ¶ 13, 912 A.2d 1237.

9

The Law Court has employed the concept of inquiry notice when determining whether a plaintiff exercised reasonable diligence in discovering fraud. See Drilling & Blasting Rock Specialists, Inc. v. Rheaume, 2016 ME 131, ¶¶ 26-27, 147 A.3d 824. "One will not be charged with knowledge of fraud merely because he has had the opportunity or power to investigate the fraud; he must be cognizant of facts that would have caused an ordinary, reasonable person to investigate." Id. ¶ 27 (quoting L.C.L Theatres, Inc. v. Columbia Pictures Indus., Inc., 566 F.2d 494, 497 (5th Cir. 1978)) (emphasis omitted).

In J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc., plaintiffs alleged fraud and breach of fiduciary duty under the Employment Retirement Security Act. That Act has a six-year statute of limitations unless plaintiffs demonstrated fraudulent concealment, which tolls the statute until plaintiffs, in the exercise of reasonable diligence, discovered or should have discovered the alleged fraud. See J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc., 76 F.3d 1245, 1251-52 (1st Cir. 1996). The court determined plaintiffs were on discovery or inquiry notice of the alleged violations more than six years before plaintiffs filed their complaint. J. Geils Band, 76 F.3d at 1250, 1260. The court concluded that plaintiffs' receipt of prospectuses put plaintiffs on notice of the alleged misrepresentations of the transactions. J. Geils Band, 76 F.3d at 1256.

In Cook v. Avien, Inc., the court determined plaintiffs' action to recover the purchase price of securities was barred by the statute of limitations. The financial data available to plaintiffs would have alerted a reasonable person to the possibility of misleading statements or omissions with regard to the sale of the notes. See Cook v. Avien, Inc., 573 F.2d 685, 697 (1st Cir. 1978). The court stated: "[t]he exercise of reasonable diligence requires an investor to be reasonably cognizant of financial developments relating to his investment, and mandates that

10

early steps be taken to appraise those facts which come to the investor's attention . . . even where facts are fraudulently withheld a plaintiff cannot be allowed to ignore the economic status of his or her investment." Cook v. Avien, Inc., 573 F.3d at 698.

In Salois v. Dime Sav. Bank, FSB, plaintiff secured residential loans from defendants and claimed defendants fraudulently concealed the negative amortization feature of the loans. Salois v. Dime Sav. Bank, FSB, 128 F.3d 20, 24 (1st Cir. 1997). The court concluded that plaintiffs' contract and fraud claims were barred by the statute of limitations because the loan documents and the monthly statements sent to plaintiffs contained the information necessary to put plaintiffs on inquiry notice of fraudulent conduct. Salois, 128 F.3d at 26. The court stated that tolling a federal statute of limitations is "appropriate only when the circumstances that cause a plaintiff to miss a filing deadline are out of his hands." Salois, 128 F.3d at 25.

The call to access plaintiff's Fidelity account was made on November 7, 2007. The funds were withdrawn between November 9, 2007 and August 13, 2008. Plaintiff learned the funds had been withdrawn in late September 2012. Plaintiff listened to the recording of the November 7, 2007 call in March 2013. Plaintiffs complaint was filed on June 5, 2014.

The court disagrees with plaintiff's argument that the facts of this case are "entirely distinguishable" from the facts in the J. Geils Band case. Throughout this time period, Fidelity sent electronically to plaintiff monthly statements that showed the withdrawals from the account. Plaintiff did not change his email address with Fidelity when he changed jobs but he would not have reviewed those statements if he had received them. Additionally, Fidelity statements could have been accessed on line. Statements from USAA and TD Bank North that showed deposits and checks written were sent monthly. Plaintiff left these on the table for Ms. Bacon. Plaintiff did not review tax statements from Fidelity, tax returns, W2s, ATM receipts, or documentation

11

regarding his assets required to be filed in court. All of the information to alert plaintiff that his Fidelity account balance was decreasing was available to him at any time from March 7, 2007 onward. See J. Geils Band, 76 F.3d at 1256. Plaintiff's fraud claim is barred by the six-year statute of limitations. 14 M.R.S. § 752.

    4. Judicial Estoppel

"To judicially estop an entity from asserting a position in a subsequent legal action (1) the position asserted in the subsequent legal action must be clearly inconsistent with a previous position asserted; (2) the party in the previous action must have successfully convinced the court to accept the inconsistent position; and (3) the party must gain an unfair advantage as a result of their change of position in the subsequent action." Linnehan Leasing v. State Tax Assessor, 2006 ME 33, ¶ 25, 898 A.2d 408, 414 (citing New Hampshire v. Maine, 532 U.S. 742, 750-51 (2001)). These factors are "neither inflexible prerequisites nor an exhaustive formula." Me. Educ. Ass'n v. Me. Comty. College Sys. Bd. of Trs., 2007 ME 70, ¶ 17, 923 A.2d 914 (citing New Hampshire v. Maine, 532 U.S. 742, 749-51 (2001)). "The purpose of the [judicial estoppel] doctrine is to protect the integrity of the judicial process." Id.

Other jurisdictions have applied the doctrine of judicial estoppel to prevent a party in a civil suit from making an argument contrary to one made in an arbitration proceeding. See Lydon v. Boston Sand & Gravel Co., 175 F.3d 6, 12-13 (1st Cir. 1999) (dual goals of judicial estoppel are "to maintain the integrity of the judicial system and to protect parties from opponents' unfair strategies"); Speroni S.P.A. v. Perceptron, Inc., 12 Fed. Appx. 355, 358-59 (6th Cir. 2001) (inconsistencies between plaintiff's positions was "a knowing assault upon the integrity of the judicial system"); Blanchette v. School Comm., 692 N.E.2d 21, 27-28 (Ma. 1998) (not inconsistent for plaintiff to seek damages in court that were not available to her in arbitration).

12

In this case, plaintiff appears to allege that defendant made a false statement of material fact to Fidelity, plaintiff's agent; defendant knew at the time the statement was false; defendant intended that Fidelity would act on the false statement; and Fidelity justifiably relied on the false statement, resulting in injury to plaintiff. See USA Flea Mkt., LLC v. EVMC Real Estate Consultants, Inc., 2006 U.S. Dist. LEXIS 71326 * 9; Grover v. Minette-Mills, Inc. 638 A.2d 712, 716 (Me. 1994). This is inconsistent with plaintiff's position in the complaint against Fidelity, which resulted in an arbitration award in plaintiff's favor for damages. Plaintiff is judicially estopped from asserting that Fidelity justifiably relied on any statement by defendant.

5. Fraud

Plaintiff has failed to prove the elements of fraud by clear and convincing evidence:

> (1) that defendant made a false representation, (2) of a material fact, (3) with knowledge of its falsity or in reckless disregard of whether it is true of false, (4) for the purpose of inducing plaintiff to act in reliance upon it, and (5) plaintiff justifiably relied upon the representation as true and acted upon it to the plaintiff's damage.

Rand v. Bath Iron Works Corp., 2003 ME 122, ¶ 9, 832 A.2d 771.

6. Conversion

Plaintiff has failed to prove the elements of conversion,[1] which include:

> (1) a showing that the person claiming that his property was converted has a property interest in the property; (2) that he has the right to possession at the time of the alleged conversion; and (3) that the party with the right to possession made a demand for its return that was denied by the holder.

Withers v. Hackett, 1998 ME 164, ¶ 7, 714 A.2d 798. In any event, 14 M.R.S. § 859 "extends only to causes of action sounding in fraud or fraudulent concealment." Drilling & Blasting Rock Specialists, Inc., 2106 ME 131, ¶ 33, 147 A.3d 824; 14 M.R.S. § 859. Plaintiff's claim for

---

[1] Plaintiff labels count II as "Conversion/Theft" but specifies conversion in the summary of the complaint. (Compl. ¶ 2.)

conversion does not benefit from section 859 and is barred by the six-year statute of limitations.

14 M.R.S. § 752.

The entry is

> Judgment is entered in favor of Defendant William Bacon and against Plaintiff Donald Landry on Plaintiff's Complaint.

Date: January 29, 2018

Nancy Mills
Justice, Superior Court

CUM CV-14-263